2025 UT App 57

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
THERON NELSON FARMER,
Appellant.

Opinion
No. 20210913-CA
Filed April 24, 2025

Second District Court, Ogden Department
The Honorable Reuben J. Renstrom
No. 191900398

Emily Adams, Freyja Johnson,
Hannah Leavitt-Howell, and Jessica Hyde Holzer,
Attorneys for Appellant

Derek E. Brown and Hwa Sung Doucette,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1 Theron Nelson Farmer and Daniel Viegas-Gonzalez (Viegas) visited the home of Farmer's long-time friend (Friend) under the guise of purchasing some Xanax from Friend. But instead, they robbed Friend, and Viegas shot Friend and Friend's brother (Brother) multiple times—killing Brother. Following the robbery, Farmer attempted to dispose of a phone and pair of socks they had taken from Friend. For these actions, Farmer was later convicted of aggravated murder, attempted aggravated murder, aggravated robbery, and obstructing justice.

¶2     On appeal, Farmer first challenges the trial court's decision not to admit, under rule 804(b)(3) of the Utah Rules of Evidence, two confessions allegedly made by Viegas indicating that Farmer was unaware of his intention to rob Friend and that he had threatened Farmer into assisting with the robbery. Next, Farmer contends that the court erred in declining his request to include a jury instruction on the affirmative defense of compulsion for the obstructing justice charge. Lastly, Farmer argues that his trial counsel (Counsel) was constitutionally ineffective for not renewing the rule 804(b)(3) motion following the testimony of one of the State's witnesses and for not requesting a unanimity instruction specifically for the obstructing justice charge. We reject Farmer's arguments and affirm his convictions.

## BACKGROUND[1]

### *Pre-crime Actions*

¶3     Farmer had known Viegas for about three weeks when, in February 2019, Viegas asked Farmer whether he "knew a place to get Xanax." Farmer texted Friend, from whom he occasionally purchased drugs, to ask if he had any Xanax. While waiting for Friend's response, Farmer, Viegas, and two other friends, Isaac and Christian, visited the home of two sisters. At trial, the sisters and Christian each testified that the group began discussing "going to hit a lick," which they explained means to "go rob somebody." Christian additionally testified that two guns were pulled out and shown to the group during this conversation. For

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Layton City v. Carr*, 2014 UT App 227, ¶ 2 n.2, 336 P.3d 587 (quotation simplified).

his part, Farmer denied that any such conversation took place or that there was any brandishing of guns.

¶4 Another friend of Farmer's, Kristina, who was not at the gathering, testified at trial that earlier that day, Farmer had called to tell her that "something big was going to happen" and instructed her "to keep [her] eyes on the news." She also testified that about a month earlier, Farmer texted her that he was bored and was going to rob someone. When Kristina protested, he responded that he was "not going to" and was "just saying."

¶5 Farmer was eventually able to get ahold of Friend, and the two agreed to meet at Friend's house to complete the Xanax purchase. Farmer and Viegas then drove to Friend's house.

*The Robbery and Shootings*

¶6 Friend testified at trial to the following events. As Friend went to answer the door, he observed Brother watching television in Brother's bedroom. At the door, Farmer introduced Viegas to Friend, and the three then sat down on the living room couch. Before money changed hands, Viegas asked to use the bathroom, and when he came back, Farmer asked to do the same. As soon as Farmer entered the bathroom, Viegas stood up and shot Friend twice—once in the chest and once in the left shoulder. Viegas demanded, "Where's the money?" Friend responded, "[I]t's in the room," referring to his own bedroom. Friend then saw Viegas run toward Brother's bedroom, and he heard two gun shots. Friend did not hear Brother make a sound. Friend also testified that Brother remained in his bedroom and did not leave it at any point before being shot.

¶7 In the meantime, as soon as Viegas began shooting, Farmer, who did not appear at all surprised by the developing situation, "bolted" into Friend's bedroom and began "ransacking" the room. Viegas returned to the living room from Brother's bedroom and resumed threatening Friend and

demanding to know where the money was. Viegas shot at Friend's legs, missing once and striking his right leg twice. Viegas then joined Farmer in Friend's bedroom, where the two "ripp[ed] everything apart."

¶8    Friend took the opportunity in Viegas's absence to dial 911 from his cellphone, which he then hid under the nearby coffee table. But due to his extreme pain, he was unable to provide responders with his address. In the recording of the 911 call, in addition to yelling and screaming, Friend can be heard telling Viegas to look in a bottom drawer. After a little over a minute, Viegas returned to the living room, retrieved the phone from under the table, and ended the call. "[S]pooked" by the call, Farmer and Viegas were "trying to hurry up and just get out of there." Viegas threatened Friend and attempted to shoot him once more, but his gun had apparently run out of ammunition.

¶9    Farmer then emerged from the bedroom wearing Friend's hat and jacket, and holding his jeans, a designer belt, and a pair of red socks. The Xanax that had been in one of the bedroom drawers was also later determined to be missing. As Farmer emerged from the bedroom, Friend was "trying to act dead." Farmer reached for his own gun and said, "We can't go back to the pen." Viegas replied, "No, he's done. Let's go. He's done." Farmer then repeated, "We can't go back to the pen, we can't go back to the pen," and the two left.

¶10    Friend remained lying on the living room floor for the next two and a half hours until his father came home and called the police. Knowing that Brother was also at home, his father ran into Brother's bedroom where he found Brother dead on his bed. He had been shot in the chest and the head.

*Post-crime Actions*

¶11    Following the robbery and shootings, Farmer and Viegas rejoined their group of friends at the sisters' house. On the drive

there, Farmer threw two phones—one of which belonged to Friend—out the car window. Police were later able to retrieve Friend's phone.[2]

¶12     At the sisters' house, Viegas spoke with Isaac in the kitchen while Farmer went into a bedroom and removed drugs from his backpack. The group then congregated in the kitchen, where Viegas talked "about how he just shot people." He also discussed disposing of the gun with Isaac.[3] This conversation scared the sisters, who then told Farmer, Viegas, and Isaac to leave the house.

¶13     Viegas then dropped Farmer off at his mother's house. There, Farmer began ingesting Xanax and cocaine. Kristina, who by then had already seen an online news article about the murder and robbery, texted Farmer that she "really appreciate[d]" him "[g]oing out of the way for" a mutual friend who had been killed while committing a different robbery. Farmer replied, "I did it for everyone." Kristina understood Farmer to be referencing Brother's homicide.[4]

¶14     Kristina and some friends picked Farmer up from his mother's house and took him to Kristina's apartment. One of those friends testified at trial that during the drive, Farmer told her that he had decided to rob Friend because he and Friend had argued and Farmer was angry, but that "it didn't go as planned"

---

2. It is unclear from our review of the record why Viegas wanted to dispose of the second phone, whose phone it was, and whether police were also able to retrieve it.

3. There was testimony suggesting that the gun in question belonged to Isaac's stepfather.

4. Confusingly, at trial Kristina also stated that there was no reason for Farmer to harm or kill Friend or Brother on the deceased friend's behalf.

because Brother, who was not supposed to be there, was home sick. Farmer told the friend that Viegas shot Friend and Brother, and Farmer searched the house. He also told her that he instructed Viegas to kill Friend so there would be no witnesses, but Viegas's gun had run out of ammunition. The friend also testified that Farmer had on a prior occasion told her, "[W]e're going to hit a lick on multiple people," although he did not identify any specific targets.

¶15    At Kristina's apartment, everyone ingested more drugs. Farmer told the group about Viegas shooting Friend and Brother, and that they had "ransacked" the house and taken everything they could. He said that they had taken Friend's phone so he could not call 911 and tossed it out the window while they were driving away. Farmer also said he was "pretty sure" Friend had died.

¶16    Farmer showed Kristina a news report of the murder in which he was pictured as a suspect and said, "[L]ook, that's me." Kristina testified that Farmer was "proud" of the article and that they discussed her acting as his alibi. They further discussed including as part of his alibi that he was afraid of Viegas. Farmer also asked another friend whether she liked his new jacket. She responded that it was "very nice" and asked where he got it. Farmer then showed her a news article about the robbery and murder.

*The Arrests*

¶17    Police interviewed Friend, who fortunately survived the shooting, at the hospital, and Friend identified Viegas and Farmer as the perpetrators. The day after the robbery, with the help of a teargas-deploying robot, police apprehended Farmer at Kristina's apartment. At the apartment, police also retrieved a pair of jeans that Friend later identified as belonging to him.

¶18 Because Farmer was still under the influence of drugs at the time of his arrest, police let him sober up in a holding cell at the sheriff's office. There, Farmer attempted to flush a pair of red socks down the toilet, causing the toilet to overflow. When asked why he had done it, Farmer responded that the socks "were dirty" and that the jail had provided him a different pair. Based on the location of certain holes on the socks, Friend was able to later identify them as the pair that he had seen Farmer holding and that had gone missing from his house following the robbery.

¶19 The State charged Farmer as a party to aggravated murder, attempted aggravated murder, and aggravated robbery—all first-degree felonies—and with one count of obstructing justice—a second-degree felony.

¶20 Viegas was also arrested and charged.[5]

*The Written Statement*

¶21 Two weeks before Farmer and Viegas's joint preliminary hearing, a jail case manager received an email (the written statement) at 2:39 a.m. from Viegas's jail email account. The text of the written statement is as follows:

> the other person involved with my case is Innocent … farmer didnt not know what was going to happen that day. and this is what happened, i asked farmer to find me some Xanax.. he did, and he did not know i was planning on robbing who ever he got them from… I asked if i could go with to his friends house and i drove there when we entered the house i asked to use the bathroom, i spit in the toilet and then farmer asked to use the bathroom

---

5. Following the trial in Farmer's case, Viegas pled guilty to aggravated murder, attempted aggravated murder, and aggravated assault.

after i came out. while he was in the bathroom me and the black guy were in the front room we walked to sit down on the couch. farmer came out and his friend asked how much we had wanted farmer looked at me.. and i shot his friend.. another guy came into the hallway from a back room i panicked and shot him too.. i then pointed the gun at farmer.. I was going to shoot him but instead told him to find what i wanted.. I kept asking the black guy where everything was he told siri to call 911 so I took his phone from him and shot him again.. i shot him a few times, farmer was yelling trying to find everything.. i went in the backroom to make sure farmer wasnt calling the cops.. , after farmer found what i wanted i told him we are leaving.. after we left he kept asking to be dropped off.. i handed him the phones and told him to throw them out the window over the bridge.. he did as told and continued to ask me to drop him off i eventually did.. when i dropped him off i told him that if he called the police his family would be in danger…

Im sorry for my actions, but farmer is innocent. ifigured it was best to say this with our court date coming up soon. i truly am sorry.

¶22 The written statement was addressed at the preliminary hearing, following which Farmer and Viegas were bound over for trial. A little over a week later, a second email was sent to the jail case manager from Viegas's email account, stating,

this is a total lie my lawyer today at court barely disclosed this information [to] me about this so called confession on this inquiry thing this is absolutely false someone in my section used my password to log on to my account and do this behind my back i guess out of hate and to help out

my co-defendant andtry to get him out of this mess of a case…. all i want to explain is we are in super max and cant always access the tablets by ourselves with our information so their is times that we give our info out with trust to people to get a tablet issued to us when we are on lockdown and im assuming someone with my info and aware of mine and my co-defendants case did this please foward this just like the last message yu sent to the court thank you and sorry for the inconvinience

¶23 Two weeks before his trial, Farmer filed a motion in limine seeking to admit the written statement as an unavailable witness's statement against interest under rule 804(b)(3) of the Utah Rules of Evidence. The State opposed the motion, arguing that the email lacked sufficient corroborating circumstances clearly indicating its trustworthiness. Specifically, the State pointed to the second email in which Viegas denied sending the written statement and suggested that it was done by someone who knew his login credentials. The State also asserted, among other things, that

- the written statement contradicted Viegas's prior statements to police made immediately following his arrest that Farmer "was the mastermind" of the robbery and that Farmer instructed him "to finish [Friend] off";

- the written statement contradicted Friend's statements that Farmer appeared unsurprised when Viegas began shooting, that Brother never left his bedroom, and that Farmer wanted to kill him before leaving; and

- physical evidence gathered at the scene—including a bullet casing and a bullet fragment found in Brother's bedroom—indicated that Brother was shot in the bedroom rather than in the hallway.

¶24    Following a hearing on the matter, the trial court denied the motion, concluding that "the circumstances do not clearly indicate the trustworthiness of the statement." The court noted that Viegas had denied sending the written statement, and it stated that "[t]he only thing tying the [written] statement to Viegas is the use of his login and password to convey it." The court also found it "problematic" that it had "absolutely no indication who had the tablet" when the written statement was sent. The court noted that login credentials to jail communication accounts are shared between inmates "on a routine basis" and although emails can be traced to specific tablet devices, those tablets are shared among inmates. Furthermore, an examination of the tablet from which the written statement was sent did not reveal the specific user at the time the email was sent. The court also pointed to the contradiction between the written statement's claim that Brother was shot in the hallway and both Friend's testimony at the preliminary hearing and the "very clear" physical evidence indicating that Brother was shot in his bedroom.

¶25    For those reasons, the court concluded that the written statement lacked the clear circumstantial guarantees of trustworthiness required under rule 804(b)(3). But the court denied the motion without prejudice to allow Farmer "the opportunity to present any further evidence establishing the reliability of" the written statement.

### *The Verbal Statement*

¶26    A week after the court's denial of the first motion, and after jury selection for the trial had already taken place, Farmer moved once more to admit the written statement under rule 804(b)(3). Counsel asserted that after the trial court had denied the first motion, Farmer informed him for the first time that Viegas had told Farmer's former cellmate (Cellmate) that Farmer was unaware of Viegas's plans to rob Friend (the verbal statement). Counsel subsequently spoke with Cellmate twice. The second

interview was recorded and played for the trial court, outside the presence of the jury.

¶27 In the second interview, Cellmate told Counsel that he and Viegas had been assigned to the same cell block for approximately six months. Cellmate stated that when he asked Viegas why he was incarcerated, Viegas responded that he had robbed and shot two people. Viegas also told Cellmate that "Farmer had no clue that was what was going on" and that he "told Farmer to get everything." Cellmate also recounted that Viegas admitted to shooting Brother in the hallway and told him that upon being shot, Brother retreated into the bedroom. Cellmate also alleged that Viegas stated that he ignored Farmer's entreaty not to kill Friend, but that when Viegas put his gun to Friend's head and pulled the trigger, the gun did not fire. Cellmate stated that he told Farmer of Viegas's verbal statement only after Farmer had informed him that the court had denied his motion to admit the written statement.

¶28 The trial court found that Cellmate's account of the verbal statement "tended to discredit rather than corroborate" the written statement and it appeared "that collusion took place." Like the written statement, the verbal statement indicated that Brother had been shot in the hallway, but the trial court noted that both physical evidence and Friend's testimony at the preliminary hearing "firmly established" that Brother had been shot in his bedroom. The court was also concerned that Cellmate—who was charged with aggravated murder in an unrelated case— "over-identifie[d]" with Farmer and his case, and that Cellmate "may be seeking a form of vindication in helping [Farmer] establish his claim of innocence." The court also noted inconsistencies regarding when Cellmate first told Farmer about the verbal statement. The court thus held that the verbal statement "not only fails to corroborate [the written statement], it is itself inadmissible because it lacks the necessary corroboration required under Rule 804(b)(3)." Accordingly, the court denied the renewed motion.

*The Trial*

¶29    In October and November 2021, the case proceeded to a five-day jury trial. Much of the evidence the State presented is summarized above. The State also called several witnesses who testified regarding the physical and forensic evidence gathered at the scene. One such witness, a crime scene investigator, testified that in Brother's bedroom there was a trail of blood droplets beginning "within six inches" from the door inside the bedroom up to the bed. The trail began with a "tiny bit" of blood nearest the door and increased in amount up to the base of the bed, at which point the blood saturated the bed itself. When asked whether that evidence was "consistent with somebody who was bleeding, and who had moved at least from close to the doorway to lay to rest where the body was found," the investigator answered, "It appears so, yes." The investigator also stated that she did not find "any evidence" that Brother had been shot in the hallway and that "the likely scenario" was that Brother had been shot in the bedroom. But she also acknowledged that it was "possible" that Brother did not start to bleed from being shot in the chest until after he had "taken two or three steps into the bedroom."

¶30    Farmer testified in his own defense as follows. He denied planning the robbery and he claimed to have been unarmed in Friend's house. He testified that as he was exiting the bathroom, Viegas suddenly shot Friend at close range. Farmer stated that while he stood there "in shock," Viegas shot Brother, who was exiting the bedroom in response to the commotion. Farmer believed that Brother had been shot in the chest because Brother grabbed his chest and retreated into the bedroom after being shot. He stated that Viegas then pointed the gun at him and ordered him "to find everything."

¶31    Farmer stated that while he was in Friend's room, he heard another gunshot and screaming, but he could only make out the word "drawer." He then proceeded to "rip[]" Friend's bedroom

"to pieces," during which time he heard more gunshots. Farmer said that when he found a bag containing drugs, Viegas entered the room and told him he "better not be calling the cops." Viegas took the bag from Farmer and put it in his own pocket, and he then placed Friend's hat and jacket on Farmer and ordered him to "grab me some more shit." Farmer said that when he exited the bedroom after grabbing a few more items, he told Viegas, who was pointing his gun at Friend, not to kill Friend. According to Farmer, Viegas then pushed him away, stating, "I can't go back to the pen," and pulled the trigger, but the gun did not fire.

¶32   Farmer testified that as they were driving away, Viegas threatened to kill him and his family if he "got [Viegas] in trouble in any sort of way or called the cops." He stated that Viegas handed him two phones and instructed him to throw them out the car window. Farmer did so, and Viegas told him to "play it cool and stay quiet." And when Viegas, Farmer, and Isaac were later expelled from the sisters' house, Viegas told him that "as long as [he] kept playing it cool, he would drop [him] off." Farmer stated that after Viegas later dropped him off at Farmer's mother's house, he did not call the police because he was afraid that Viegas was listening to a police scanner and would return to retaliate against him or his family. As for the socks he later attempted to flush in the holding cell, Farmer claimed that they belonged to him and not Friend.

*The Jury Instructions and Verdict*

¶33   At the close of evidence, Counsel requested a compulsion defense jury instruction for the aggravated robbery and obstructing justice charges. As for the obstruction charge, Counsel argued that the fact that Viegas had just shot two people and had threatened to kill Farmer and his family, "when taken cumulatively," constituted an "ongoing imminent threat" to Farmer. The trial court gave the compulsion instruction for the aggravated robbery charge but it declined to include a similar instruction for the obstruction charge. It concluded that Farmer's

testimony that Viegas had handed him Friend's phone "and he just threw it out" the car window as they drove away from the scene of the crime lacked sufficient specificity to warrant a compulsion instruction because Farmer could have reasonably dropped the phones on the car floor instead. There was no discussion regarding Farmer's later attempt to flush Friend's socks down the toilet.

¶34 During closing argument, the State argued that Farmer obstructed justice when he both threw the phones out of the car window and when he later attempted to flush the socks. Counsel countered, arguing that Farmer threw the phones out the window intending "to try to end a horrible situation and get [Viegas] to drop him off and let him go"—not to hinder the investigation. Counsel similarly argued that Farmer lacked the requisite intent when he attempted to flush the socks due to his high level of inebriation.

¶35 But the jury instruction on the obstruction charge provided only the elements for the charge without specifying which act— the throwing of the phones or the flushing of the socks—the jury should consider. The jury was also generally instructed to "[t]ry to reach unanimous agreement, but only if you can do so honestly and in good conscience" and that "every single juror must agree with the verdict before the defendant can be found guilty or not guilty." The jury instructions did not, however, direct that the jurors must all unanimously agree on the same act to convict Farmer of the obstruction charge.

¶36 The jury returned a guilty verdict on all four charges. Farmer appeals.

ISSUES AND STANDARDS OF REVIEW

¶37 Farmer raises several issues for our consideration. First, he argues that the trial court erred when it excluded the written

statement and the verbal statement for not satisfying the trustworthiness requirement of rule 804(b)(3) of the Utah Rules of Evidence. In reviewing a trial court's decision regarding the admission of evidence, appellate courts "review the threshold statement of the legal principle governing admission or exclusion for correctness," the "findings of facts pertinent to a determination for clear error," and "the ultimate ruling on admissibility for abuse of discretion." *State v. Johnson*, 2022 UT 14, ¶ 17, 508 P.3d 100 (quotation simplified). But the parties disagree as to which of these standards applies to the trial court's determination regarding whether the claimed statements against interest are "supported by corroborating circumstances that clearly indicate [their] trustworthiness." Utah R. Evid. 804(b)(3)(B). Farmer contends that this determination is a legal question that is reviewed for correctness, whereas the State argues that it is reviewed for an abuse of discretion. We agree with the State.

¶38   In *State v. Clopten*, 2015 UT 82, 362 P.3d 1216, our Supreme Court reviewed for an abuse of discretion the trial court's determination that proffered hearsay "statements were not sufficiently contrary to [the declarant's] self-interest" to be admissible under rule 804(b)(3). *Id.* ¶ 17. *See* Utah R. Evid. 804(b)(3)(A) (setting forth the requirement that the hearsay statement be one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency . . . to expose the declarant to civil or criminal liability"). Although *Clopten* concerned rule 804(b)(3)'s first requirement—and not the second requirement, which is at issue in this case—we see no meaningful distinction for standard-of-review purposes between the determination of whether a statement is sufficiently contrary to the declarant's self-interest and whether the statement is sufficiently corroborated by "circumstances that clearly indicate its trustworthiness." Utah R. Evid. 804(b)(3)(B). Indeed, both requirements guard against fabrication and ensure that the

statement is sufficiently trustworthy to warrant exempting the statement from the general rule against hearsay.[6] *See State v. Drawn*, 791 P.2d 890, 894 (Utah Ct. App. 1990) (stating, in the context of discussing rule 804(b)(3)'s first requirement, that "statements that would not subject a person to criminal liability . . . lack trustworthiness") (quotation simplified), *cert. denied*, 804 P.2d 1232 (Utah 1990). We therefore review this issue under the abuse of discretion standard.[7]

---

6. Farmer points to this court's decision in *In re D.D.*, 2021 UT App 100, 500 P.3d 868, *cert. denied*, 505 P.3d 56 (Utah 2022), which states that "[a] lower court's determination that a confession is sufficiently trustworthy to be admitted into evidence is a legal determination." *Id.* ¶ 26. But that case is distinguishable because at issue in that case was whether the trial court had correctly performed its "gatekeeping function," established by our Supreme Court in *State v. Mauchley*, 2003 UT 10, ¶ 58 & n.6, 67 P.3d 477, of determining whether a *defendant's* out-of-court confession was sufficiently corroborated to be "deemed trustworthy by a preponderance of the evidence." *In re. D.D.*, 2021 UT App 100, ¶ 29 (quotation simplified). For the reasons articulated above, we are bound by our Supreme Court's application of the abuse of discretion standard in the rule 804(b)(3) context.

7. We also note that several federal circuit courts of appeal that have reviewed the corroboration of trustworthiness requirement under rule 804(b)(3)'s federal counterpart have done so for an abuse of discretion. *See, e.g.*, *United States v. Taylor*, 848 F.3d 476, 487 (1st Cir. 2017); *United States v. Caldwell*, 760 F.3d 267, 290 (3d Cir. 2014); *United States v. Tropeano*, 252 F.3d 653, 659 (2d Cir. 2001); *United States v. Spring*, 80 F.3d 1450, 1460 (10th Cir. 1996); *United States v. Bumpass*, 60 F.3d 1099, 1102–03 (4th Cir. 1995); *United States v. Ospina*, 739 F.2d 448, 452 (9th Cir. 1984). *But see, e.g.*, *United States v. Yellowhorse*, 86 F.4th 1304, 1309 (10th Cir. 2023)

(continued…)

¶39 Next, Farmer contends that the trial court erred in not instructing the jury on the affirmative defense of compulsion for the obstructing justice charge. The parties also disagree on the governing standard of review for this issue, with Farmer asserting that it is a question of law reviewed for correctness and the State contending that it is reviewed for an abuse of discretion. Although the State is technically correct, Farmer's argument ultimately carries the day in a practical sense.

¶40 "The refusal to give a jury instruction is reviewed for abuse of discretion, although in some circumstances that discretion will be narrowly constrained." *State v. Johnson*, 2025 UT App 13, ¶ 23, 564 P.3d 519 (quotation simplified), *cert. filed*, Apr. 2, 2025 (No. 20250336). That is, "in certain circumstances a district court's discretion will be constrained such that a party is legally entitled to have a particular instruction given to the jury. In those circumstances, refusal constitutes an error of law, and an error of law always constitutes an abuse of discretion." *Miller v. Utah Dep't of Transp.*, 2012 UT 54, ¶ 13 n.1, 285 P.3d 1208. *See State v. Drommond*, 2020 UT 50, ¶ 49, 469 P.3d 1056 ("We review a trial court's refusal to give a jury instruction for abuse of discretion. We afford significant deference on issues that are primarily or entirely factual but little or no deference on issues that are primarily or entirely legal.") (quotation simplified), *abrogated on other grounds by State v. Lovell*, 2024 UT 25.

¶41 As elaborated upon in Part II below, a trial court "is obligated to give" a requested jury instruction on an affirmative defense "if evidence has been presented . . . that provides any reasonable basis upon which a jury could conclude that the affirmative defense applies to the defendant." *State v. Smith*, 2019 UT App 141, ¶ 31, 449 P.3d 971 (quotation simplified), *cert. denied*,

---

(reviewing rule 804(b)(3)'s corroboration of trustworthiness requirement for clear error); *United States v. Hall*, 165 F.3d 1095, 1112 (7th Cir. 1999) (same); *United States v. Price*, 134 F.3d 340, 348 (6th Cir. 1998) (same).

456 P.3d 390 (Utah 2019). Accordingly, "if the court refuses to provide such an instruction in those circumstances, the refusal constitutes an error of law," which ultimately "constitutes an abuse of discretion." *Johnson*, 2025 UT App 13, ¶ 24 (quotation simplified).

¶42 Lastly, Farmer claims that Counsel rendered ineffective assistance in two respects: (1) when he did not raise a rule 804(b)(3) motion for a third time after the crime scene investigator offered testimony that corroborated both the written statement and the verbal statement and (2) when he did not request a unanimity instruction specifically for the obstructing justice charge. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Herrera*, 2025 UT App 1, ¶ 15, 563 P.3d 416 (quotation simplified).

ANALYSIS

I. Rule 804(b)(3)

¶43 Rule 804(b)(3) of the Utah Rules of Evidence provides an exception to the general rule against hearsay for statements against interest when the declarant is unavailable as a witness.[8] A statement is not excluded as hearsay under this rule if:

> (A) a reasonable person in the declarant's position
> would have made [the statement] only if the person
> believed it to be true because, when made, it was so
> contrary to the declarant's proprietary or pecuniary
> interest or had so great a tendency to invalidate the

---

8. The trial court ruled that Viegas was unavailable as a witness because, if called to testify, he was expected to assert his Fifth Amendment rights. This ruling is not challenged on appeal.

> declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>
> (B) [the statement] is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Utah R. Evid. 804(b)(3).

¶44 Only the second requirement—whether the statement "is supported by corroborating circumstances that clearly indicate its trustworthiness," *id.* R. 804(b)(3)(B)—is at issue in this appeal. Notably, because the corroborating circumstances must "clearly indicate" the statement's trustworthiness, *id.*, "the showing of corroborating circumstances must do more than tend to indicate the trustworthiness of the statements," *United States v. Ospina*, 739 F.2d 448, 452 (9th Cir. 1984).[9] "The inference of trustworthiness from the proffered corroborating circumstances must be strong, not merely allowable." *United States v. Lozado*, 776 F.3d 1119, 1132 (10th Cir. 2015) (quotation simplified).

¶45 Farmer challenges the trial court's decision not to admit the written statement and the verbal statement under rule 804(b)(3). We address each statement in turn. As discussed, we review the trial court's decision in each instance for an abuse of discretion. Farmer thus has the "heavy burden" of establishing that "no

---

9. When interpreting the Utah Rules of Evidence, "[w]e may also rely on interpretations of similar federal rules by federal courts to assist our own interpretation." *Robinson v. Taylor*, 2015 UT 69, ¶ 10, 356 P.3d 1230. *Cf. Supernova Media, Inc. v. Pia Anderson Dorius Reynard & Moss, LLC*, 2013 UT 7, ¶ 40 n.8, 297 P.3d 599 ("Interpretations of the Federal Rules of Civil Procedure are persuasive where . . . the Utah Rules of Civil Procedure are substantially similar to the federal rules.") (quotation simplified).

reasonable person would take the view adopted by the trial court." *Goggin v. Goggin*, 2013 UT 16, ¶ 26, 299 P.3d 1079 (quotation simplified). *See Osguthorpe v. Rudd (In re Estate of Osguthorpe)*, 2021 UT 23, ¶ 57, 491 P.3d 894 (stating that an appellate court will find an abuse of discretion only if the trial court's decision "fell outside of the bounds of reasonableness and rationality") (quotation simplified). *See also Tolman v. Salt Lake County Att'y*, 818 P.2d 23, 26 (Utah Ct. App. 1991) ("Discretion encompasses the power of choice among several courses of action, each of which is considered permissible.") (quotation simplified).

A.    The Written Statement

¶46    Following an evidentiary hearing on the matter, which was held about a week prior to the trial in this case, the trial court denied Farmer's rule 804(b)(3) motion to admit the written statement on the ground that "the circumstances do not clearly indicate the trustworthiness of the statement." In so ruling, the trial court pointed to Viegas's subsequent denial of ever sending the email containing the written statement, coupled with the fact that inmates shared their login information "on a routine basis" and the lack of any indication of who possessed the tablet at the time the written statement was sent. The court also based its decision on the contradiction between the written statement's claim that Viegas shot Brother in the hallway and both Friend's testimony and the "very clear" physical evidence indicating that Brother had been shot in his bedroom. Additionally, when later presented with a recording of Cellmate recounting the verbal statement to Counsel, the court, for reasons discussed in more detail in Part I.B. below, found that the verbal statement "tended to discredit rather than corroborate" the written statement and it appeared "that collusion took place."

¶47    In arguing that the written statement's trustworthiness was clearly corroborated, Farmer cites the facts that the written statement was sent from Viegas's jail account and that the statement "was not motived by self-interest." He also asserts that

the written statement and Viegas's subsequent email denying having authored it share "idiosyncrasies in grammar, capitalization, and spelling," suggesting that the same person wrote both emails. Specifically, Farmer points to "inconsistent capitalization of the pronoun 'I,' frequent use of ellipses in place of periods, a lack of apostrophes, and a lack of [punctuation] between distinctly different sentences."[10] Farmer also contends that the written statement is corroborated, in part, by Friend's trial testimony that Viegas confiscated Friend's phone in the living room after Friend dialed 911—which Farmer asserts he could not have known because he was in Friend's bedroom at the time.

¶48 But the corroborating circumstances to which Farmer points are insufficient to establish an abuse of discretion by the trial court. For the written statement to be admissible under rule 804(b)(3), Farmer had the burden of proffering "corroborating circumstances that *clearly* indicate its trustworthiness." Utah R. Evid. 804(b)(3)(B) (emphasis added). Although the written statement was sent from Viegas's jail email account, it was not unreasonable for the court to also consider Viegas's subsequent email denying authorship and the fact that his login information was available to other inmates. The possibility that Viegas did not send the written statement likewise undermines Farmer's assertion that it did not promote Viegas's self-interest. It also was not unreasonable for the trial court to consider the forensic evidence presented at the evidentiary hearing—including a bullet casing and bullet fragment found in Brother's bedroom—that contradicted the written statement's claim that Brother was shot in the hallway. Given these considerations, we cannot say that no reasonable person would have adopted the trial court's view that Farmer had not met his burden of proffering corroborating circumstances *clearly* supporting an inference of trustworthiness

---

10. The State disagrees with this assessment, contending that other than the predominant use of lower-case letters, "there are *no* idiosyncratic similarities between the two emails," and offering several examples of dissimilarities between the two.

for the written statement. *See United States v. Lozado*, 776 F.3d 1119, 1132 (10th Cir. 2015).

¶49 Accordingly, the trial court did not abuse its discretion when it excluded the written statement from Farmer's trial.

## B. The Verbal Statement

¶50 A week after the trial court denied Farmer's first motion, and after jury selection was already completed, Farmer brought a second rule 804(b)(3) motion in which he proffered the verbal statement. After reviewing the recording of Counsel's interview with Cellmate, the trial court denied the motion. Notably, it found that Cellmate's account of the verbal statement "tended to discredit rather than corroborate" the written statement and it appeared to the court "that collusion took place." The court was left with the impression that Cellmate "over-identifie[d]" with Farmer and that he was "seeking a form of vindication in helping [Farmer] establish his claim of innocence." Additionally, the court heard evidence that Farmer and Cellmate had been cellmates for over a year and that they had formed a friendship, including that Cellmate's girlfriend put money in Farmer's jail account and that Farmer had used Cellmate's credentials to make phone calls. The court also pointed to inconsistencies regarding the timing of Cellmate coming forward with the verbal statement. Counsel indicated that Farmer told him to investigate the verbal statement immediately following the hearing at which the trial court denied the motion to admit the written statement—meaning that Cellmate must have told Farmer of the verbal statement prior to the hearing. But Cellmate stated that he informed Farmer for the first time of the verbal statement after Farmer had returned from that hearing and told him that the court had denied the motion. Finally, the court reiterated that physical evidence contradicted the verbal statement's claim that Brother was shot in the hallway.

¶51 Farmer points to the following circumstances that he asserts corroborate the verbal statement: the verbal statement

"closely follows" the written statement, Viegas had no reason to inculpate himself on Farmer's behalf as the two were not close, Farmer did not know Cellmate prior to their incarceration, Farmer's and Cellmate's cases were unrelated, Cellmate did not stand to benefit from disclosing the verbal statement, and there was no evidence that Viegas was coerced to make the verbal statement to Cellmate.

¶52 As with the written statement, notwithstanding these circumstances, we cannot say that the trial court abused its discretion in determining that the corroborating circumstances did not *clearly* support the verbal statement's trustworthiness. We cannot say it was unreasonable for the trial court to consider Cellmate's friendship with Farmer, his apparent emotional investment in Farmer's case, and the questionable timing of Cellmate's coming forward with the verbal statement after the first motion's denial, particularly when coupled with the physical evidence suggesting that Brother was shot in his bedroom, as significantly detracting from any other corroborating circumstances. This is especially the case because rule 804(b)(3) sets a high threshold of requiring that the statement's trustworthiness be *clearly* supported by corroborating evidence. Although another judge might have concluded otherwise, the trial court's determination was nonetheless reasonable. *See Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2015 UT App 261, ¶¶ 21, 24, 361 P.3d 703 (Orme, J., concurring, joined by Toomey, J.) (stating that under the abuse of discretion standard, appellate courts must affirm cases even when other judges might have ruled differently, so long as the trial court's decision is "within the broad range of discretion entrusted to" it), *cert. denied*, 369 P.3d 451 (Utah 2016).

¶53 For these reasons, the trial court likewise did not abuse its discretion when it excluded the verbal statement.

## II. Compulsion Jury Instruction

¶54 When a criminal defendant requests a jury instruction on an affirmative defense, including compulsion, a trial court is obligated to provide one so long as evidence has been presented at trial that, "when viewed in the light most favorable to the defense," "provides any reasonable basis upon which a jury could conclude that the affirmative defense applies to the defendant." *State v. Johnson*, 2025 UT App 13, ¶¶ 24, 29, 564 P.3d 519 (quotation simplified), *cert. filed*, Apr. 2, 2025 (No. 20250336). But "a court need not instruct the jury on the requested affirmative defense where the evidence is so slight as to be incapable of raising a reasonable doubt in the jury's mind as to whether the defendant acted in accordance with that affirmative defense." *State v. Smith*, 2019 UT App 141, ¶ 31, 449 P.3d 971 (quotation simplified), *cert. denied*, 456 P.3d 390 (Utah 2019).

¶55 The affirmative defense of compulsion is set forth in Utah Code section 76-2-302(1), which states,

> A person is not guilty of an offense when he engaged in the proscribed conduct because he was coerced to do so by the use or threatened imminent use of unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would not have resisted.

In other words, "to assert the affirmative defense of compulsion, the defendant must have been faced with a specific, imminent threat of death or serious bodily injury to himself or a third person and the defendant must have had no reasonable legal alternative to violating the law." *State v. Dozah*, 2016 UT App 13, ¶ 17, 368 P.3d 863 (quotation simplified). To be "imminent," "it must appear that [the threat] had been communicated to the defendant that he would be subjected to physical force presently." *Smith*, 2019 UT App 141, ¶ 32 (quotation simplified). And "a threat

directed to some indefinite time in the future is not an imminent threat for purposes of the defense of compulsion." *State v. Ott*, 763 P.2d 810, 812 (Utah Ct. App. 1988) (quotation simplified).

¶56 Here, the State charged Farmer with one count of obstructing justice but told the jury during closing argument that Farmer obstructed justice when he (1) tossed the phones out the car window as he and Viegas drove away from the scene of the crime and (2) attempted to flush Friend's socks while in the holding cell. Although the trial court provided a compulsion instruction for the aggravated robbery charge, it declined to do so for the obstructing justice charge, concluding that based on Farmer's testimony, the threat was not sufficiently specific and Farmer could have alternatively tossed the phones on the car floor. Farmer contends that this constituted legal error because there was a reasonable basis in the evidence to warrant a compulsion instruction for either action underlying the obstruction charge.[11]

¶57 Farmer points to the following portions of his trial testimony as supporting a compulsion instruction: after shooting Friend and Brother, Viegas pointed his gun at Farmer and ordered him to "find everything"; Viegas thereafter shot Friend a few more times; in the car, Viegas threatened to kill Farmer and his family if he contacted police; Viegas told Farmer to throw the phones out the window; Viegas told Farmer to "play it cool and stay quiet"; and when Viegas, Farmer, and Isaac later left the sisters' house, Viegas told Farmer that "as long as [he] kept playing it cool, he would drop [him] off." But none of this

---

11. The State suggests that Farmer's argument was not preserved with respect to his attempt to flush the socks. Because "the merits of [this] claim can easily be resolved in favor of the party asserting that the claim was not preserved," we address the merits of Farmer's argument on this point without resolving whether it was preserved. *State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (quotation simplified), *cert. denied*, 496 P.3d 718 (Utah 2021).

testimony, even when viewed in the light most favorable to Farmer, provides a reasonable basis from which a jury could conclude that Farmer was acting under an imminent and specific threat of death or serious injury to himself or his family when he attempted to dispose of the phones or the socks.

¶58    As concerns the phones, Farmer testified that Viegas instructed him to throw them out the car window, but he did not state that Viegas paired the request with a threat of imminent death or injury—or any threat whatsoever. The only specific threats of imminent death or injury to which Farmer testified occurred in Friend's house during the robbery—for which the trial court included a compulsion instruction for the aggravated robbery charge. But again, no such threats occurred in the car before Farmer tossed the phones. And even the subsequent threat Viegas allegedly made to kill Farmer and his family at "some indefinite time in the future," *Ott*, 763 P.2d at 812 (quotation simplified), if Farmer contacted the police—not if he refused to toss the phones—was not a sufficiently imminent threat to trigger a compulsion defense. Moreover, Farmer testified that when Viegas attempted to shoot Friend one last time as they were leaving, the gun would not fire. This was corroborated by testimony from Friend and one of the friends at Kristina's apartment that Viegas's gun had run out of ammunition. Indeed, Farmer testified that Viegas was highly motivated to shoot Friend one more time prior to leaving the house as he repeatedly said that he could not "go back to the pen." Thus, Viegas was no longer able to carry out the threats he had previously made in Friend's house. At most, Farmer feared Viegas and wished to be dropped off at home, which is insufficient to give rise to a compulsion instruction. *See State v. Rivera*, 2019 UT App 27, ¶ 31, 440 P.3d 694 ("[F]earing for one's safety is not the same as being coerced to engage in illegal activity.").

¶59    As for the act of flushing the socks, at the time of the act Viegas was nowhere near Farmer, who was in police custody. Farmer also did not testify that he had any reason to believe that

Viegas was in the immediate vicinity of any of his family members or even that Viegas knew that he had been taken into police custody. Accordingly, there was absolutely no imminent threat of death or injury to compel him to attempt to dispose of the socks. Moreover, Farmer testified that the socks belonged to him and not to Friend and that he attempted to flush them because he was inebriated and believed they "were dirty." He did not claim that he attempted to flush the socks out of fear of Viegas—much less due to any threats of immediate death or injury that Viegas had made.

¶60   Because this evidence does not provide a reasonable basis on which a jury could conclude that Farmer acted under compulsion, the trial court did not err when it refused to include a jury instruction on compulsion for the obstructing justice charge.

### III. Ineffective Assistance of Counsel

¶61   To establish an ineffective assistance of counsel claim, a criminal defendant must show that (1) defense "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant's "failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182.

¶62   Under the first prong, defense counsel's performance is deficient if it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "Judicial scrutiny of counsel's performance" is "highly deferential" in that there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Accordingly, "even if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350. *See*

*State v. Paule*, 2024 UT 2, ¶ 71, 554 P.3d 844 ("Counsel's performance can be objectively reasonable despite a failure to employ the best strategy.") (quotation simplified).

¶63 Under the second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "A verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *State v. Baugh*, 2024 UT 33, ¶ 42, 556 P.3d 35 (quotation simplified).

¶64 Farmer argues that Counsel was ineffective for not bringing the rule 804(b)(3) motion for a third time following the crime scene investigator's testimony and for not requesting a unanimity instruction specifically for the obstructing justice charge. We address each argument in turn.

A.     Renewed Rule 804(b)(3) Motion

¶65 Farmer contends that Counsel was ineffective for not raising the rule 804(b)(3) motion to admit the written statement and the verbal statement for a third time following the crime scene investigator's testimony regarding the blood trail beginning approximately six inches from the door inside the bedroom and continuing from there to the bed.[12] He asserts that this testimony

---

12. Farmer also cites the testimony of another investigator that a bullet hole in the bedroom wall was "shallow." But this testimony does not establish whether Brother was standing in the hallway or a few feet further back behind the door in his bedroom when shot for the first time. Farmer also references a forensic pathologist's assessment that the shot to Brother's head was from a closer distance than the shot to his chest. But this too is irrelevant

(continued…)

corroborated the claim in both statements that Brother was shot in the hallway, which was the trial court's "main hangup" with admitting the statements, and he argues that "[t]he forensic evidence supporting this point was crucial to convincing the court that the confession had corroborating circumstances of trustworthiness." Because we hold that Counsel did not perform deficiently in not renewing the motion during trial, Farmer's ineffective assistance claim fails.

¶66    Counsel was not "objectively unreasonable" for not raising the same motion for a third time. *Scott*, 2020 UT 13, ¶ 36. Although the trial court certainly relied on the contradiction between the physical evidence presented at the evidentiary hearing indicating that Brother was shot in the bedroom—and not in the hallway—when denying both prior motions, as recounted in detail in Part I above, it was certainly not the only reason the court concluded that the statements lacked clear indicia of trustworthiness. Additionally, although the crime scene investigator acknowledged that it was "possible" that Brother did not start to bleed from being shot in the chest until after taking a few steps backward from the hallway into the bedroom, she still testified that "the likely scenario" was that Brother was in the bedroom when shot. She also testified that there was not "any evidence" of Brother being shot in the hallway. Counsel therefore could have reasonably concluded that this testimony was not so compelling as to warrant raising the location-of-the-shooting issue in a third motion, particularly in light of the other problems the trial court had with the two statements.

B.    Unanimity Instruction

¶67    The Unanimous Verdict Clause of the Utah Constitution directs that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. It is "well-established" that this

---

as it merely suggests that Viegas continued moving closer to Brother between firing the two shots.

"constitutional requirement of unanimity is not met if a jury unanimously finds only that a defendant is guilty *of a crime*." *State v. Paule*, 2024 UT 2, ¶ 67, 554 P.3d 844 (emphasis in original, quotation otherwise simplified). Rather the "jury verdict must also be unanimous as to each count of *each distinct crime charged* by the prosecution and submitted to the jury for decision."[13] *Id.* (emphasis in original, quotation otherwise simplified). Accordingly, "where the evidence indicates that more than one distinct criminal act has been committed but the defendant is charged with only one count of criminal conduct, the jury must be unanimous as to which act or incident constitutes the charged crime." *State v. Granere*, 2024 UT App 1, ¶ 33, 543 P.3d 177 (quotation simplified), *cert. denied*, 558 P.3d 87 (Utah 2024). And "where neither the charges nor the elements instructions link each count to a particular act, instructing the jury that it must agree as to which criminal acts occurred is critical to ensuring unanimity on each element of each crime." *Id.* (quotation simplified).

¶68 Here, the State presented evidence of two instances for which the jury could have convicted Farmer of obstructing justice: Farmer's act of throwing the phones out the car window as he and Viegas drove away from the scene of the crime and his attempt to flush Friend's socks while in the holding cell. And during closing argument, the State pointed to both acts when discussing the obstruction charge. But Farmer was charged with only one count of obstruction and the jury instruction for that

---

13. This principle is demonstrated by the following oft-cited example:

> A verdict would not be valid if some jurors found a defendant guilty of robbery committed on December 25, 1990, in Salt Lake City, but other jurors found him guilty of a robbery committed January 15, 1991, in Denver, Colorado, despite all jurors finding him guilty of the elements of the crime of robbery.

*State v. Paule*, 2024 UT 2, ¶ 67, 554 P.3d 844 (quotation simplified).

charge did not specify which of the two acts the jury should consider, nor did it instruct the jury that it must unanimously agree as to which obstructive act he committed. Farmer thus argues that Counsel was ineffective for not requesting a proper unanimity instruction.

¶69　We note that this is an issue that in recent years has appeared with some frequency in Utah's appellate courts, and it did so even prior to the 2021 trial in this case. *See, e.g., State v. Mendoza*, 2021 UT App 79, ¶¶ 8–17, 496 P.3d 275; *State v. Gollaher*, 2020 UT App 131, ¶¶ 30–33, 474 P.3d 1018, *cert. denied*, 481 P.3d 1040 (Utah 2021); *State v. Whytock*, 2020 UT App 107, ¶¶ 30–32, 469 P.3d 1150, *cert. denied*, 481 P.3d 1043 (Utah 2021); *State v. Case*, 2020 UT App 81, ¶¶ 21–23, 467 P.3d 893, *cert. denied*, 474 P.3d 948 (Utah 2020); *State v. Alires*, 2019 UT App 206, ¶¶ 17–22, 455 P.3d 636, *cert. denied*, 466 P.3d 1076 (Utah 2020). And our appellate courts have decided more such cases since the trial. *See, e.g., State v. Chadwick*, 2024 UT 34, ¶¶ 58–67, 554 P.3d 1098; *State v. Baugh*, 2024 UT 33, ¶¶ 23–36, 556 P.3d 35; *Paule*, 2024 UT 2, ¶ 67; *State v. Macleod*, 2024 UT App 32, ¶¶ 59–60, 546 P.3d 366, *cert. denied*, 558 P.3d 87 (Utah 2024); *State v. Mottaghian*, 2022 UT App 8, ¶¶ 54–58, 504 P.3d 773, *cert. denied*, 525 P.3d 1256 (Utah 2022). By now, Utah's unanimity requirement is more than "well-established" by our caselaw. *Paule*, 2024 UT 2, ¶ 67 (quotation simplified). Accordingly, it should be common practice by now to include a proper unanimity instruction in cases where the number of potential criminal acts presented to the jury exceeds the number of corresponding charged counts. Indeed, with this case law in mind, the State does not contest Farmer's assertion that Counsel performed deficiently by not requesting a unanimity instruction specifically for the obstructing justice charge. With that said, because Farmer has not shown prejudice, his ineffective assistance claim fails.

¶70　An "ineffective assistance claim can succeed only if [the defendant] can demonstrate that the problem with the jury instructions mattered: that is, that there existed a reasonable probability of a different outcome had the jury been provided a

specific unanimity instruction."[14] *Mottaghian*, 2022 UT App 8, ¶ 59. And here, the evidence strongly supported a conviction for, at the very least, the act of throwing the phones out the car window.

¶71 Farmer himself admitted to tossing the phones after Viegas handed them to him and instructed him to do so. His defense was that in doing so, he did not intend to impede the investigation, but, rather he was "try[ing] to end a horrible situation and get [Viegas] to drop him off and let him go." And on appeal, Farmer's prejudice argument is wholly reliant on his compulsion argument, asserting that if the jury had "been instructed on compulsion, there is a reasonable likelihood that it would have found that [he] threw the phones away because he was forced to do so." Because we affirm the trial court's denial of a compulsion instruction for that charge, this argument also necessarily fails.

¶72 In sum, because there is not a reasonable probability that the jury would have acquitted Farmer of the obstruction charge if it had been properly instructed on the unanimity requirement, Farmer has not demonstrated that Counsel was ineffective for not requesting such an instruction.

---

14. The prejudice standard is higher in cases where the unanimity issue was preserved. That is, as with other constitutional errors, the lack of a proper unanimity instruction carries a rebuttable presumption of prejudice. *See State v. Chadwick*, 2024 UT 34, ¶ 57, 554 P.3d 1098. But where the unanimity issue was not preserved, the defendant carries the burden of showing prejudice. *See id.* ¶¶ 49, 54 (stating that the requirement that the defendant show prejudice "is generally reserved for a category of claims brought for the first time on appeal" and declining to apply that standard to a preserved unanimity claim); *State v. Baugh*, 2024 UT 33, ¶ 42, 556 P.3d 35 (applying the *Strickland* prejudice standard to a unanimity issue brought as an ineffective assistance of counsel claim).

CONCLUSION

¶73    The trial court did not exceed its discretion when it denied Farmer's rule 804(b)(3) motions to admit the written statement and the verbal statement, nor when it denied his request for a compulsion instruction on the obstructing justice charge. Additionally, Counsel was not ineffective for not raising the rule 804(b)(3) motion for a third time during trial, or for failing to request a proper unanimity instruction on the obstruction charge.

¶74    Affirmed.

———