2026 UT App 8

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHRISTOPHER JAY RILE DEUEL,
Appellant.

Opinion
No. 20230434-CA
Filed January 23, 2026

Fourth District Court, Provo Department
The Honorable M. James Brady
No. 215400188

Emily Adams and Anna Grigsby,
Attorneys for Appellant

Jeffrey S. Gray and McKay Lewis,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 After an automobile accident in which he rear-ended another vehicle, Christopher Jay Rile Deuel was charged with and convicted of three counts of driving under the influence (DUI) and one count of possession or use of a controlled substance. On appeal, Deuel challenges his convictions, arguing that the trial court erroneously admitted the entirety of a toxicology report that confused the issue before the jury and that the trial court should have allowed the admission of his written witness statement under the statements-against-interest hearsay exception in the evidence rules. We find merit in Deuel's argument regarding the toxicology report, and we accordingly reverse and remand the

matter for a new trial. We additionally provide some guidance on the hearsay issue, which is likely to arise again in a new trial.

BACKGROUND

¶2     On December 21, 2021, Deuel was driving along a two-lane highway in Cedar Fort, Utah, taking his fiancée (Fiancée) to a doctor appointment. Another driver (Driver), who was a newly licensed sixteen-year-old out delivering holiday gifts with two of her younger relatives, was driving some distance ahead of Deuel and was slowing down to make a left-hand turn. Fiancée later explained that she "was in a lot of pain" at the time and when their truck "hit a bump" in the road, she "gasped," which caused Deuel, who knew she suffers from epilepsy, to "look[] over at [her] to make sure [she] wasn't having a seizure." Fiancée said that the glance lasted "maybe a half a second" and that when Deuel looked back to the road, Driver's vehicle was "there stopped" and Deuel "just didn't have enough time to react to it," resulting in them hitting Driver's vehicle going "[f]ifty miles an hour." Driver's "vehicle was thrown from the roadway and spun around to face the opposite direction." Driver and both her passengers were injured to some degree in the collision.

¶3     After police arrived at the accident site, a responding officer (Officer) noted "that [Deuel] was rather agitated and slightly aggressive towards those on the scene" and "that his eyes were red and bloodshot." These physical features, combined with the fact that "this type of accident is fairly uncommon in broad daylight," made Officer "suspicious that impairment may be a factor." Deuel was placed in the back of a police vehicle while Officer helped clear the accident scene. Video footage from a camera inside the police vehicle showed Deuel "falling asleep or nodding off" at one point during this wait.

¶4     After clearing the scene, Officer returned to the police vehicle and asked Deuel to participate in field sobriety testing;

Deuel consented, and the testing was recorded on Officer's dashboard camera. In the recording, Officer made no inquiry into any "medical needs or pre-existing conditions" Deuel may have had or whether "he was taking any prescribed medications that might affect his ability to perform on the field sobriety tests." However, Deuel conveyed to Officer during the testing that he has attention-deficit/hyperactivity disorder (ADHD) and that this makes it "hard for him to follow instructions." Deuel also communicated to Officer during testing that because his "toes are numb" and "all fucked up," he has "no equilibrium," making certain requested tasks difficult. Deuel further indicated that he has "back problems" and a "[b]ad knee." Nonetheless, no accommodation was provided to Deuel during the testing to address these limitations.

¶5 Officer administered the three standard field sobriety tests. First, he performed a "horizontal gaze nystagmus" test. This involves passing an item "in front of the person's eyes back and forth a number of different times" while looking for certain clues.[1] Out of the six total possible clues on this test, Officer "only observed two," but this "increased [his] suspicion" that Deuel was impaired. Second, Officer performed "the nine-step walk-and-turn test," which has eight possible clues, with two clues indicating impairment. On this test, Officer observed two clues— one when Deuel stepped off the line he was asked to stay on and

---

1. Officer explained at the subsequent trial that a clue is "some sort of identifying mark that [police] look for during . . . field sobriety testing to help [them] determine whether or not somebody's impaired." He described a cue, on the other hand, as "an abnormality" that "isn't a guaranteed" indication of impairment but simply "additional evidence . . . [to] take into consideration." Thus, we focus primarily on the clues observed in the testing and not the few cues Officer also mentioned (pinpoint pupils, bloodshot eyes, fluttering eyelids, and distended neck veins that indicated a fast heart rate).

one when "he had to put his arms out to help him maintain balance." Third, Officer performed the "one-leg stand" test. Of the four possible clues on this test, Officer observed two—that Deuel "swayed" and that "his arms came away from his body greater than six inches to help him maintain balance." Officer testified that two or more clues on this test are indicative of impairment.

¶6      Officer then administered two additional field sobriety tests that he had been trained to perform. First, he performed the "lack of convergence" test, wherein he passed his finger around Deuel's face in a circular motion, getting closer with each turn, to see if Deuel was "able to naturally go cross eyed." Officer performed the test twice, and Deuel "was unable to go cross eyed" either time. Finally, Officer performed the "modified Romberg test," which involved having Deuel close his eyes and estimate the passage of thirty seconds. For each of the two times Officer performed this test, Deuel "counted extremely fast," once estimating the thirty seconds at eighteen seconds and once estimating the thirty seconds at fifteen seconds.

¶7      After administering the five field sobriety tests, Officer concluded that Deuel "was impaired and unsafe to [operate] a motor vehicle," and Officer placed Deuel under arrest. Deuel was then transported to the hospital "to be checked for injury," and while there, Deuel consented to a blood draw. The results of that testing later showed 23 nanograms per milliliter (ng/mL) of amphetamine and 386 ng/mL of methamphetamine in Deuel's blood. Thereafter, a toxicology report detailing these findings was prepared by a toxicologist (Toxicologist).

¶8      Deuel was ultimately charged with three counts of DUI (one count each for Driver and her two passengers) and one count of possession or use of a controlled substance. The case proceeded to trial.

¶9      At trial, the State called Officer as its first witness, and he testified to the events recounted above. During Officer's

testimony, the State presented security camera footage that it had obtained from a nearby residence that showed the collision. Although the footage does not clearly show whether Driver's turn signal was on, it does confirm that Driver's "vehicle was slowing to make a left-hand turn, and [Deuel's] pick-up truck struck it directly from behind." Officer testified that this was inconsistent with Deuel's original statement to him that Driver's "car just pulled out in front of him out of nowhere." During cross-examination, defense counsel (Counsel) walked through the dashboard camera video footage of the field sobriety tests conducted on Deuel, asking Officer about Deuel's repeated statements about his physical and mental limitations and Officer's failures to attempt to provide accommodation responsive to those limitations.

¶10    After Officer testified, Counsel brought an issue about the admissibility of the toxicology report to the attention of the trial court. Counsel stated that the defense was "willing to stipulate to the findings on the report" but was objecting to its admission under rule 403 of the Utah Rules of Evidence. *See* Utah R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). Counsel asserted that parts of the report itself would "confus[e] the jury on the issues," specifically pointing to the portions of the report that set forth "clinical reference ranges [that] have been reported" and that discussed "exposure" versus "impairment." Counsel also argued that unless the State presented an expert witness with the "expertise and the ability to explain exactly what the ranges mean," then they were not relevant information for the jury to consider. The trial court responded, "[A]t this point I'm not going to exclude it, but if there is foundation that you feel needs to be laid, . . . I'll address it at the appropriate time . . . ."

¶11     The State next called Driver and her two passengers to testify regarding the accident and their resulting injuries. Each testified that Driver's turn signal was on as she prepared to turn left.

¶12     As its final witness, the State called Toxicologist, who had conducted the testing on Deuel's blood sample and prepared the resultant toxicology report. During Toxicologist's testimony, the State offered the report into evidence, and Counsel renewed his rule 403 objection. The trial court denied the objection, stating, "I'm going to allow this to be admitted, it would be certainly subject to cross examination and clarification."

¶13     Toxicologist testified regarding the contents of her toxicology report. She relayed that Deuel had tested positive for amphetamine and methamphetamine, with the sample containing 386 ng/mL of methamphetamine. The State then directed Toxicologist to the following language from the report that explained the methamphetamine findings: "Stimulant effects have been reported at blood concentrations up to 100 ng/mL with toxicity reported above 200 ng/mL. The reporting limit is 20 [ng/mL] in blood and 100 ng/mL in urine. If a urine result is reported, it indicates prior exposure, not impairment." When questioned as to the meaning of this language, Toxicologist explained that "you would expect to see some sort of effects on [a] person when they're at 100 [ng/ML]" and that "when you start getting into toxicity you're looking at the difference between whether or not something can be harmful or helpful." And when specifically asked to provide the toxicity level for methamphetamine, Toxicologist simply responded, "The report has it as 200 nanograms per milliliter." Toxicologist did not assert any toxicity level apart from this reference to the report.

¶14     On cross-examination, Counsel asked Toxicologist about the test results and their relationship to impairment, and Toxicologist answered, "I can't determine any degree of

impairment based on my results, but I can talk about what you would typically expect to see." Counsel also questioned Toxicologist as to how the toxicity level was determined, and Toxicologist responded, "I would assume it was based on case study research, but otherwise I can't say for certain." Counsel then referenced the language in the report about exposure versus impairment based on a urine sample and asked, "[W]ith blood is there a standardized way for you to be able to detect impairment or just detection? . . . [S]imilar to that urinary statement that's included in the toxicology report, is there a way for you to know based on a number whether or not a person is impaired?" Toxicologist answered, "The best way we can tell is just those numbers that are provided in the report." However, she also again acknowledged that there was no "set number" that indicated impairment.

¶15 The State then rested, and the defense presented its case, first recalling Officer as a witness. Counsel showed Officer a written witness statement that Deuel had completed on the day of the accident. But when Counsel moved to introduce the written statement into evidence, the State objected on hearsay grounds. Out of the presence of the jury, the trial court told Counsel that the statement was indeed hearsay and that if the defense chose to provide Deuel's testimony in this way, "then he [could] be cross examined." Counsel argued that the statement should be allowed in as a statement against interest under rule 804 of the Utah Rules of Evidence. *See* Utah R. Evid. 804(b)(3). Counsel asserted that because Deuel admitted in his statement to "being distracted" before the collision, the statement was "obviously a statement made against his own interest." The court responded that the statement was "still going to be a statement by [Deuel]" and that the court would "allow cross examination if it's admitted." At this point, Counsel asked no further questions of Officer and moved on to call his next witness without introducing Deuel's statement into evidence.

¶16    Fiancée next testified, explaining that she had lived with Deuel for four years and that he had several mannerisms that may appear "abnormal" to others, including that "he mumbles," "he slurs his words a lot," and "he can't sit down or he goes to sleep." She related that Deuel "struggle[es] with some serious health issues," has "severe ADHD," and has "[v]ery serious hearing issues." And although Fiancée was aware that Deuel "still had occasionally been using methamphetamine," she believed that he was "not at all" impaired by methamphetamine on the day of the accident and that his driving that day was not unsafe. She explained that she had seen Deuel impaired by methamphetamine previously and that at those times he "goes and hides and just avoids people." In contrast, Fiancée stated that the speech, behavior, and mannerisms exhibited by Deuel in the police videos (when he was waiting in the police car and when he was participating in the field sobriety tests) are "just how he is." As to the accident itself, Fiancée stated that Driver's car was "stopped in the middle of the highway" with "no signal" and that she did not "even recall seeing brake lights." Finally, Fiancée admitted that she had prior convictions for both forgery and theft by deception.

¶17    The defense then called Deuel's mother (Mother) as a witness. Mother testified that Deuel had called her right after the accident and that she had immediately driven the four miles from her home to the accident site. She stated that she had the opportunity to see and speak with Deuel and that she noticed nothing "uncommon or strange" about his behavior. She said that he was worried that his father, who had recently died, would be upset about the damaged truck "from beyond the grave." She also testified, consistently with Fiancée's observations, that when Deuel was impaired by methamphetamine, "[h]e would go off in his own little world." Mother referenced Deuel's many health challenges, including "a bad foot," "a bad knee," "a really bad shoulder," "back problems," "hearing issues," and speech that was affected due to his hearing issues. And Mother believed that

Deuel would often self-medicate with methamphetamine in an attempt to treat his ADHD. Mother testified that due to Deuel's various medical issues, she was not surprised that he struggled with parts of the field sobriety tests.

¶18 The defense rested, the jury was instructed, and the attorneys made their closing arguments. The prosecutor recognized the State's burden to show that Deuel was incapable of safely operating a vehicle and then highlighted Officer's testimony regarding Deuel "nodding off" in the back of the police vehicle as well as Deuel's behavior during, and the results of, the field sobriety tests. The prosecutor also highlighted the toxicology report and stated, "As you heard [Toxicologist] testify, stimulant effects have been reported up to 100 nanograms, and toxicity has been reported at 200 nanograms, but he had 386 nanograms of methamphetamine in his system."

¶19 In response, Counsel argued that the toxicity number that the prosecutor "wanted to throw at" the jury did not "have any impact whatsoever on whether or not a person is impaired." Counsel reminded the jury, "Methamphetamine affects people differently. The Legislature has not given a specific number like they have with alcohol."

¶20 The jury convicted Deuel as charged, and he timely appealed his convictions.

ISSUES AND STANDARDS OF REVIEW

¶21 Deuel's first assertion of error involves the trial court's refusal to exclude the toxicology report under rule 403 of the Utah Rules of Evidence. "[W]e review a trial court's decision to admit or exclude evidence under rule 403 for an abuse of discretion." *State v. Beverly*, 2018 UT 60, ¶ 23, 435 P.3d 160. "A [trial] court abuses its discretion if it applies the wrong legal standard or if its

decision is beyond the limits of reasonability." *State v. Richins*, 2025 UT 10, ¶ 18, 568 P.3d 1046 (quotation simplified).

¶22    Deuel next challenges the trial court's refusal to admit into evidence his written witness statement under the hearsay exception for statements against interest. *See* Utah R. Evid. 804(b)(3). "In reviewing a trial court's decision regarding the admission of evidence, appellate courts review the threshold statement of the legal principle governing admission or exclusion for correctness, the findings of facts pertinent to a determination for clear error, and the ultimate ruling on admissibility for abuse of discretion." *State v. Farmer*, 2025 UT App 57, ¶ 37, 569 P.3d 267 (quotation simplified), *cert. denied*, 574 P.3d 522 (Utah 2025).[2]

## ANALYSIS

### I. The Toxicology Report

¶23    Deuel first argues that the trial court erred in denying his objection to the toxicology report. He argues that the toxicology report was inadmissible under rule 403 of the Utah Rules of Evidence because its probative value was substantially outweighed by the dangers of confusing the issues and misleading the jury. His argument does not center on the report results that disclosed the specific levels of amphetamine and methamphetamine measured in his blood sample—indeed, Deuel was willing to stipulate to those facts—but on a paragraph in the report that set forth levels at which "[s]timulant effects" and "toxicity" of methamphetamine "have been reported" and that discussed "exposure" versus "impairment." He argues that the jury "could have reviewed the report and determined that [he]

---

2. Deuel additionally advanced a merger argument in his initial brief on appeal. But in his reply brief, he withdrew that argument, and we therefore do not address it further.

must have been impaired because the level of methamphetamine in his blood far exceeded the toxicity level." We agree.

¶24    To convict, the State bore the burden to prove that Deuel was operating a vehicle while under the influence of a drug "to a degree that render[ed] [him] incapable of safely operating a vehicle." Utah Code § 41-6a-502(1)(b). Unlike in a case with a DUI charge based on alcohol consumption, when considering a DUI charge based on drug use, there is no chemical test result that will alone meet the elements of the charge. *Compare id.*, *with id.* § 41-6a-502(1)(a) (providing that the DUI offense is proven when "a subsequent chemical test shows that the [driver] has a blood or breath alcohol concentration of .05 grams or greater at the time of the test"). Thus, the toxicology report's discussion of the levels of reported stimulant effects and toxicity, as well as its reference to impairment, were not directly probative of the issue here, that is, whether Deuel's methamphetamine use had rendered him incapable of safely operating a vehicle. While the State argues that the threshold numbers were probative because they "help[ed] contextualize how much methamphetamine [Deuel] had in his system," we do not agree that this is so, at least without further expert testimony about how these threshold numbers were developed and what they meant in relation to the ability to safely operate a vehicle. And we agree with Deuel that without this further information, the report's mention of a specific "toxicity" level of 200 ng/mL was likely to confuse the issues and mislead the jury into thinking that a test result far above that amount indicated significant impairment that would render a person incapable of safely operating a vehicle. Thus, the trial court exceeded its discretion in allowing the admission of the report in its entirety.

¶25    The State counters that even if the admission of the toxicity portion of the toxicology report was an abuse of discretion, the result of such admission was harmless. *See State v. Reece,* 2015 UT 45, ¶ 33, 349 P.3d 712 ("An error is harmless and does not require

reversal if it is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." (quotation simplified)). In support of its argument, the State points to what it characterizes as "the overwhelming evidence of [Deuel's] guilt" as well as the facts that Counsel successfully elicited from Toxicologist that there is no set amount of methamphetamine that is indicative of impairment and that Counsel reiterated that concession in his closing argument.

¶26    We disagree with the State. First, while we recognize that "[e]rrors are often harmless where there is overwhelming evidence in the record of the defendant's guilt," *id.*, we do not agree that this case can be characterized in such a way. There was some dispute among the witnesses about whether Driver had her turn signal on immediately before the accident, and the security footage introduced at trial did nothing to clear up that dispute. Nor did the security footage show Deuel swerving, stumbling, or exhibiting any classic signs of impairment. Additionally, the results of the field sobriety tests were weak. The standard tests revealed only six out of eighteen possible clues, and in conducting these tests, Officer made no accommodations to address the cognitive and physical limitations Deuel raised that had the potential to impact his performance. Further, there was at least some corroborating evidence of these cognitive and physical limitations in the form of Mother's and Fiancée's trial testimony. While the State points to some inconsistent or curious statements made by Deuel and Fiancée, as well as to Fiancée's "prior crimes of dishonesty," we are not convinced that these considerations are sufficiently significant to convince us that admission of the toxicology report in its entirety was harmless.

¶27    Second, although Counsel was able to elicit Toxicologist's admission that there was no "set number" for impairment, Toxicologist also stated in that same exchange that the "best way" she could tell whether a person was impaired was "those numbers

that are provided in the report." And while Counsel did argue in closing that a chemical test result in the toxic range "doesn't have any impact whatsoever on whether or not a person is impaired," the prosecutor had relied on the toxicity level to suggest just the opposite: "[Toxicologist] testified that [Deuel] had 386 nanograms of methamphetamine in his system at the time that his blood was drawn. . . . 386 nanograms. As you heard [Toxicologist] testify, stimulant effects have been reported up to 100 nanograms, and toxicity has been reported at 200 nanograms, but [Deuel] had 386 nanograms of methamphetamine in his system." Thus, we are not convinced that Counsel's efforts on this front did much to lessen the harm of admitting the toxicology report.

¶28　Because we conclude that the trial court exceeded its discretion in admitting the toxicology report in its entirety, and because we cannot "conclude there is no reasonable likelihood that the error affected the outcome of the proceedings," *id.* (quotation simplified), we vacate Deuel's convictions and remand this case to the trial court for a new trial.

## II. Deuel's Written Statement

¶29　While our decision as to the toxicology report is dispositive of this appeal, we also choose to address the issue related to Deuel's written statement to police, as that issue is likely to arise again in a new trial.[3] *See State v. Ogden*, 2018 UT 8, ¶ 49, 416 P.3d

---

3. Deuel also raises, in the alternative, an ineffective assistance of counsel claim related to the admissibility of his written statement, accompanied by a motion for a remand under rule 23B of the Utah Rules of Appellate Procedure. *See* Utah R. App. P. 23B(a) ("A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel."). Because we have already

(continued…)

1132 ("Although it is unnecessary to our decision, we retain the authority to reach issues when we believe our analysis could prove helpful on remand."); *State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867 (recognizing that when there are "other issues presented on appeal that will likely arise during retrial," appellate courts have "discretion to address those issues for purposes of providing guidance on remand"). So, while we need not review the trial court's specific admissibility decision made during trial, we provide the following guidance to the court should it be faced with a similar admissibility challenge at a new trial.

¶30 Deuel argues that his written police statement was admissible under rule 804 of the Utah Rules of Evidence. Rule 804 identifies several situations in which the court may allow evidence of out-of-court hearsay statements made by a declarant who is "unavailable as a witness." Utah R. Evid. 804(b). One such exception is a statement against interest, that is, a statement that (1) "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to . . . criminal liability" and (2) "is supported by corroborating circumstances that clearly indicate its trustworthiness." *Id.* R. 804(b)(3).

¶31 Rule 804 enumerates several situations in which a declarant is considered unavailable as a witness, including the situation where the declarant "is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies." *Id.* R. 804(a)(1). "One such privilege is the declarant's Fifth Amendment right against self-incrimination." *United States v. Morrow*, 79 F.4th 1169, 1179 (10th Cir. 2023). And "[w]hile a witness may not be able to claim the

---

determined that Deuel is entitled to a new trial, we need not address this additional argument on appeal, and we accordingly also deny the rule 23B motion.

privilege indirectly through counsel, a defendant in his own criminal trial may unequivocally claim the privilege through his attorney." *State v. Maestas*, 2012 UT App 53, ¶ 65, 272 P.3d 769. Thus, Deuel's claim of this privilege would, as the State concedes, render him unavailable as a witness for purposes of rule 804.

¶32 But the unavailability of the declarant is simply a preliminary requirement for the application of the rule 804 hearsay exceptions. Once unavailability has been established, the court's analysis must turn to the other requirements of rule 804 that focus on the reliability of the declarant's statement. *See State v. Farmer*, 2025 UT App 57, ¶ 38, 569 P.3d 267 ("[B]oth requirements [of rule 804(b)(3)] guard against fabrication and ensure that the statement is sufficiently trustworthy to warrant exempting the statement from the general rule against hearsay."), *cert. denied*, 574 P.3d 522 (Utah 2025). As to the statement against interest exception, the court must further find that the declarant's statement had "so great a tendency" to expose the declarant to criminal liability that "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true," and that "corroborating circumstances . . . clearly indicate [the statement's] trustworthiness." Utah R. Evid. 804(b)(3). While these are discretionary determinations to be made by the trial court in the first instance, we take this opportunity to briefly address the standard in making the first of these two determinations, as Deuel's appellate arguments seem to understate the requirement regarding an exposure to criminal liability.

¶33 Deuel argues that the statement against interest exception should apply here because "[t]here is a possibility that [Deuel's] conduct could have constituted reckless driving" and therefore his statement "exposed him to criminal liability." But even if a declarant's "statements have at least *some* tendency to expose him to criminal liability, this does not necessarily mean that his statements have a *sufficient* tendency to expose him to punishment

that a reasonable person would not utter them if they were not true." *State v. Clopten*, 2015 UT 82, ¶ 21, 362 P.3d 1216. In making the determination of whether a statement has a *sufficient* tendency to expose the declarant to liability, the court must "look to the circumstances under which the statement was given," *id.* ¶ 19 (quotation simplified), and in doing so, the court is "entitled to weigh the tendency of [the declarant's] statement[] to expose him to criminal liability against [his] other motives for uttering the statement[]," *id.* ¶ 21. Thus, a statement that raises *some* potential for criminal liability does not necessarily meet the requirement of this hearsay exception, particularly when one can readily conceive of self-serving motivations the declarant may have had to make the statement at issue.[4] These considerations should all be a part of the trial court's admissibility analysis should this issue again arise upon remand.

## CONCLUSION

¶34 The trial court exceeded its discretion in admitting the toxicology report over Deuel's rule 403 objection, and such error was harmful. We therefore reverse Deuel's convictions and remand the matter to the trial court for a new trial.

———————

4. Knowing he was suspected of DUI, a statement suggesting he was only distracted and perhaps only guilty of reckless driving is not obviously a statement against Deuel's interest.