**2025 UT App 13**

### THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DANIEL LEE JOHNSON,
Appellant.

Opinion
No. 20220836-CA
Filed January 30, 2025

Second District Court, Ogden Department
The Honorable Jennifer L. Valencia
No. 211900931

Freyja Johnson and Rachel Phillips Ainscough,
Attorneys for Appellant

Derek E. Brown, John J. Nielsen, and David A.
Simpson, Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Daniel Lee Johnson got into an argument with his friend, Chris,[1] over the phone. Shortly thereafter, Chris went to Johnson's house and demanded to speak to him. An altercation ensued, which ended when Johnson shot Chris in the face. Chris died from the bullet wound, and Johnson was charged with murder and other crimes.

¶2 At Johnson's trial, he requested that the district court instruct the jury on the affirmative defenses of perfect and

---

1. A pseudonym.

imperfect self-defense. The court denied his request, and the jury convicted him as charged.

¶3     Johnson now appeals his murder conviction. For the reasons set forth below, we agree with Johnson that the district court exceeded its discretion when it denied his request to instruct the jury on imperfect self-defense and that he was harmed by that denial. We therefore reverse his conviction and remand the matter for a new trial.

BACKGROUND

¶4     Johnson and Chris were friends who had known each other for about a year. They would frequently "hang out" and would also sometimes work together as handymen.

¶5     One morning, as Johnson was getting ready to run an errand, Chris showed up at Johnson's home. Johnson asked Chris if he could watch his children (Son and Daughter) while he ran the errand. Although it was not typical for Chris to watch the children, Chris agreed to do so.

¶6     Johnson returned home early in the evening. On his way home, Johnson picked up dinner for his children and Chris. He also stopped to purchase gambling tickets from a gas station for himself and Chris. After eating dinner, Johnson and Chris sat on the porch to smoke cigarettes and check the gambling tickets to see if they had won anything. Johnson's ticket won $138. Johnson asked Chris if he could drive Chris's car to the gas station to redeem the ticket. Chris agreed. But after Johnson started the car and was preparing to leave, Chris got into the car and suggested that the two go together to cash in the ticket. Johnson declined, explaining that he could not leave his children home alone. Chris continued to insist that he wanted to go to cash in the ticket, so Johnson gave him the winning ticket and exited the car. Chris then told Johnson he would return with his winnings in "two or three

days." Unsatisfied with this timeline, Johnson asked Chris to return his ticket. Chris gave Johnson a ticket, but it was not Johnson's winning ticket.

¶7     Less than two hours later, Johnson realized that Chris had given him the wrong ticket. Johnson called Chris on the phone, and the two argued about the ticket. Johnson decided he "was done" with Chris, and he told Chris not to return to his house and that he could "just keep the money."

¶8     Around 8:30 p.m. that evening, Chris returned to Johnson's house. Son informed Johnson, who was in the bathroom at the time, that Chris was outside and wanted to talk to him. Johnson instructed Son to tell Chris "to leave" because Johnson "did not want to talk to him." Son followed Johnson's instruction, but Chris refused to leave. Son returned to Johnson, who told him to relay the message to Chris a second time; Chris again refused to leave.

¶9     When Son returned to Johnson for the third time, he reported that Chris "was very mad." Johnson could hear Chris "pounding on the side of the [house] and on the door and screaming." Johnson was "scared" of Chris because of "the way he was presenting himself"; Johnson had "never seen him like that before." Johnson observed that Chris was "very aggressive" and "very angry," and although Johnson had seen Chris angry before, this time the "degree of anger was unusual."

¶10    In response to Chris's behavior, Johnson went into his bedroom to retrieve a pistol. He hoped that "showing" Chris the gun would "[s]care him off." After collecting the gun, Johnson walked to the front door. The front door consisted of a wooden inner door and an outer storm door. When Johnson arrived at the front door, the wooden door was closed. He put the gun in his right hip pocket and opened the wooden door with his right hand. Chris was standing inside the opened storm door. While still holding the wooden door with his right hand, Johnson used his

left hand to reach across his body and remove the gun from his right hip pocket. After pulling the gun out, he put it to his side.

¶11     According to Johnson, at that point, Chris saw the gun, which caused him to take a step back and slam the storm door in Johnson's face. As Chris was attempting to slam the storm door, Johnson moved his left hand, which was still holding the gun, up to block the door. During that process, the gun "went off" and Chris "fell backwards."

¶12     Once Johnson realized what had happed, he "panicked and ran back inside the house." He put the gun away, gathered his children, who had been inside the house during the event, and took them to his neighbor's (Neighbor) house. Johnson told Neighbor that he "might be going . . . to jail" because he had "killed a man." When Neighbor asked Johnson to clarify, Johnson explained that there was an event "earlier that day where somebody had come over, and was threatening his children, and to get the threats to stop," he "did what [he] had to do, [he] shot him in the face." Johnson did not provide Neighbor with specific details about how the person had been threatening his children, other than to say there were "shouts" and "bangs on the window." Neighbor stated that after this, Johnson informed him he needed to go "clean up the body." Johnson then returned to his house, loaded Chris's body into Chris's car, and drove the car to a parking lot at a church, where he abandoned it.

¶13     After Chris's body was discovered, police interviewed Johnson, who was the owner of the phone number that had last called and sent text messages to Chris's phone. During an initial interview with Johnson that took place at his house, Johnson denied any involvement with Chris's death. His story changed, however, during a subsequent interview at the police station. After repeated questioning, Johnson told police he had shot Chris, but he maintained that it was an accident. He explained that Chris had "scared the hell out of [his] kids" by "pounding on the door

and the windows" of his house, so he grabbed his gun to "scare" Chris so that he would leave. Johnson stated that the gun "went off" after Chris "slammed the [storm] door on . . . [his] arm." Johnson claimed the gun had a "hair trigger" and that he did not recall pulling the trigger, nor did he remember hearing the gun go off.

¶14    As part of the investigation, Son and Daughter were interviewed at the Children's Justice Center (CJC). Son reported that on the day of the incident, Chris "stole a whole bunch of stuff from" Johnson, including a rent check and the gambling ticket. Son said that when Johnson found out, he texted Chris, who came over to the house and "started banging on [the] door." At that point, Son told Johnson that Chris was at the house, and Johnson said he did not want to talk to Chris. Son said Chris then "started calling [Johnson] a whole bunch of names" and "was hitting [the] house."

¶15    Son stated that after Chris started hitting the house, Johnson came out of his bedroom with a gun "to protect himself just in case he was getting attacked." Son explained that Johnson "thought that [Chris] might have a gun" because Chris was bipolar and he "wasn't on his meds." Son recounted that as Johnson went to open the wooden front door to face Chris, Johnson was holding the gun on the side of his leg. As Johnson started to open the door, Chris "went to attack him." Son explained that Chris "started to run towards" Johnson and went to "punch" him or "tackle" him. Then, Johnson raised the gun from his side "really fast" and it discharged. Son expressed that everything occurred "in the blink of an eye" and that Johnson had acted in "self-defense." However, Son also stated multiple times during the interview that the shooting was an accident and that Johnson thought the gun "was on safety."

¶16    Daughter similarly stated that Chris came to the house looking to speak to Johnson. When Son told Chris that Johnson

did not want to talk to him, Chris "started banging on [the] house and saying bad words and swearing at" Johnson. Daughter said that when Johnson shot Chris, she "saw sparks come out" and observed Chris "falling backwards slowly" to the ground after he was shot. Johnson told Daughter that he "wanted to scare" Chris but the gun "wasn't on safety."

¶17 The State charged Johnson with murder, obstructing justice, abuse or desecration of a human body, and possession or use of a firearm by a restricted person. At trial, the State called several witnesses, including Neighbor and the police officers who interviewed Johnson. In rebuttal, Daughter's CJC interview was played for the jury.

¶18 As part of his case-in-chief, Johnson testified in his own defense, and he also played a recording of Son's CJC interview. Johnson's version of events was largely consistent with the account he had given to police during his interview at the station. Johnson testified that he did not intend to shoot Chris and that he had taken the gun out of his room because he was "scared" of Chris and wanted to scare him away. However, Johnson's trial testimony regarding how the gun went off was slightly different from his prior account to police. Johnson testified that despite originally telling the officers that the gun went off after his arm was hit by the storm door, the "correct story" was that the gun went off after it "hit the [storm] door." He also stated that the gun did not go off "by itself" when it hit the door. Johnson explained that although he did not "recall exactly the details of that moment," he "imagin[ed]" he squeezed the trigger of the gun.

¶19 After all the witnesses had finished testifying, Johnson requested that the jury be instructed on both perfect and imperfect self-defense. He argued the circumstantial evidence was adequate to prove that he reasonably believed he was protecting his children where the evidence showed (1) that his children were "scared because [Chris was] beating on the side of their house and

yelling obscenities" and (2) that Johnson was "scared" because he had never seen Chris "that upset," "that agitated," and "that violent." The district court took the matter under advisement.

¶20    On the final day of trial, the district court revisited the issue of the requested self-defense jury instructions. Defense counsel again argued that the facts supporting such instructions were that Chris was "pounding on the door, . . . yelling, swearing, [and] scaring the children" and that Chris was exhibiting "a whole new degree or level of anger" than Johnson had ever seen before. In addition, counsel pointed to Son's CJC interview, noting that Son "said it was self-defense."

¶21    The district court ultimately declined Johnson's request. The court concluded that although Chris's actions created a "general unease" and Son had "use[ed] the word self-defense" during his CJC interview, Chris's being "off [his] meds and pounding on the door, making a loud noise" did not "rise[] to the level of an imminent risk of death or serious bodily injury."

¶22    The jury convicted Johnson as charged. He now appeals.

ISSUE AND STANDARD OF REVIEW

¶23    Johnson argues the district court exceeded its discretion when it denied his request to instruct the jury on self-defense.[2] "[T]he refusal to give a jury instruction is reviewed for abuse of discretion, although in some circumstances that discretion will be

---

2. Johnson raises two other issues on appeal and has also filed a motion requesting a remand pursuant to rule 23B of the Utah Rules of Appellate Procedure. Because we reverse and remand this matter for a new trial based on the district court's refusal to instruct the jury on self-defense, we need not reach the merits of these remaining claims.

narrowly constrained." *Miller v. Utah Dep't of Transp.*, 2012 UT 54, ¶ 13, 285 P.3d 1208.

ANALYSIS

¶24 "When a criminal defendant requests a jury instruction regarding a particular affirmative defense, the court is obligated to give the instruction if evidence has been presented—either by the prosecution or by the defendant—that provides any reasonable basis upon which a jury could conclude that the affirmative defense applies to the defendant." *State v. Low*, 2008 UT 58, ¶ 25, 192 P.3d 867. If the court refuses to provide such an instruction "in those circumstances," the "refusal constitutes an error of law, and an error of law always constitutes an abuse of discretion." *State v. Berriel*, 2013 UT 19, ¶ 10, 299 P.3d 1133 (quotation simplified). Here, Johnson contends he was entitled to have the jury instructed on self-defense, including both perfect and imperfect self-defense, as there was a reasonable basis in the evidence for such instructions. Further, he argues the court's failure to provide a self-defense instruction constituted a harmful error because it prevented him from presenting a complete defense to the charges against him.

¶25 Under Utah law, the use of deadly force in self-defense is justified "only if the individual reasonably believes that force is necessary to prevent death or serious bodily injury to the individual or another individual as a result of imminent use of unlawful force, or to prevent the commission of a forcible felony." Utah Code § 76-2-402(2)(b). Self-defense may be perfect or imperfect. A person acts in perfect self-defense when his belief that deadly force is necessary is "both reasonable and legally justified" under the circumstances. *State v. Silva*, 2019 UT 36, ¶ 29, 456 P.3d 718. Imperfect self-defense, in contrast, does not require an individual to show that the use of force was legally excusable under the circumstances. *See id.* ¶¶ 26, 29. Rather, to succeed under a theory of imperfect self-defense, a person must show only

that he had a reasonable, but mistaken, belief "that the circumstances provided a legal justification or excuse for the conduct." *Id.* ¶ 33 (quotation simplified).

¶26 The "reasonable belief" standard is the same for both perfect and imperfect self-defense, *id.*, and entails both a subject and objective component. The "belief" component is subjective, *State v. Sorbonne*, 2022 UT 5, ¶ 27, 506 P.3d 545, whereas the "reasonable" component is objective, *id.* ¶ 28; *see also* Utah Code § 76-5-203(4)(b) (stating that whether the actor's belief was reasonable is "determined from the viewpoint of a reasonable person under the then existing circumstances"). Factors that the trier of fact may consider in determining the reasonableness of a defendant's belief include "the nature of the danger," "the immediacy of the danger," "the probability that the unlawful force would result in death or serious bodily injury," "the other individual's prior violent acts or violent propensities," and "any other relevant factors." Utah Code § 76-2-402(5).

¶27 Here, the district court rejected Johnson's request to instruct the jury on self-defense for lack of an imminent risk of death or serious bodily injury. On the record before us, we conclude the court exceeded its discretion in so ruling.

¶28 As an initial matter, it appears the district court applied the wrong standard when analyzing Johnson's request. In its oral ruling, the court announced that a self-defense instruction was not warranted because, while Chris's actions were "concerning," they did not "rise to the level of a reasonable belief" that the use of deadly force was necessary. But that is not the standard that a court must apply when evaluating a request for a jury instruction regarding a particular affirmative defense. As articulated above, a court is obligated to provide the instruction if the evidence presented "provides *any reasonable basis* upon which a jury could conclude that the affirmative defense applies to the defendant." *Low*, 2008 UT 58, ¶ 25 (emphasis added); *see also State v. Garcia*,

2017 UT 53, ¶ 44, 424 P.3d 171 (stating that a defendant must clear a "low[] bar . . . to instruct the jury on an imperfect self-defense"); *State v. Rivera*, 2019 UT App 27, ¶ 22, 440 P.3d 694 (noting that a defendant's "burden of proof with regard to an affirmative defense . . . is quite limited" (quotation simplified)). Once that initial showing has been made, "the jury, not the court, should be tasked with determining whether" the defendant's actions satisfied each element of the defense. *See Rivera*, 2019 UT App 27, ¶ 26; *see also State v. Campos*, 2013 UT App 213, ¶ 41, 309 P.3d 1160 (explaining that after a defendant "produce[s] enough evidence to raise a reasonable basis for the affirmative defense," "the burden shifts to the State to prove to the jury . . . that the defense lacks merit" (quotation simplified)), *cert. denied*, 320 P.2d 676 (Utah 2014).

¶29 Applying the correct standard, it is readily apparent that Johnson was at least entitled to an instruction on imperfect self-defense because the evidence, when viewed "in the light most favorable to the defense," *State v. Spillers*, 2007 UT 13, ¶ 20, 152 P.3d 315, *abrogated on other grounds by State v. Reece*, 2015 UT 45, 349 P.3d 712, provides a reasonable basis from which a jury could conclude that Johnson acted in imperfect self-defense.[3] Notably, the details Son provided in his CJC interview spoke to the nature and immediacy of the danger posed by Chris. Son repeatedly said that Chris moved "to attack" or "punch" Johnson prior to the gun

---

3. Johnson contends the district court was obligated to instruct the jury on both perfect and imperfect self-defense. While we agree that Johnson was entitled to an imperfect self-defense instruction and are reversing and remanding the matter on that basis, we stop short of holding that the court was required to instruct on perfect self-defense. On remand, the court—after considering the evidence presented at any eventual new trial—may conclude that a perfect self-defense instruction is warranted, and if it so determines, the court is not precluded from providing such an instruction.

discharging. Son also explained that everything happened very quickly, "in the blink of an eye." And Johnson's own testimony revealed his subjective belief at the time of the shooting. Johnson testified that he was scared of Chris because of "the way he was presenting himself." He explained that Chris was "very aggressive" and "very angry" and that although he had seen Chris angry before, this time the "degree of anger was unusual." Moreover, the statements Johnson made to Neighbor shortly after the incident, that Chris had been "threatening his children" and Johnson had "shot" him "to get the threats to stop," bolstered Johnson's testimony that he was scared of Chris. Lastly, as the district court acknowledged when evaluating Johnson's request, there was testimony presented indicating that Chris's actions were scaring the children, who were both inside the house during the altercation.

¶30    Although Johnson was entitled to have the jury instructed on imperfect self-defense, the district court's error in refusing to provide the instruction does not warrant reversal unless the error was harmful. *See Reece*, 2015 UT 45, ¶ 39; *see also* Utah R. Crim. P. 30(a). "[A]n error is harmful only if the likelihood of a different outcome is sufficiently high that it undermines our confidence in the verdict." *State v. Evans*, 2001 UT 22, ¶ 20, 20 P.3d 888. Here, Johnson has persuaded us that the court's failure to provide the requested instruction constituted harmful error.

¶31    Johnson's primary defense theory at trial was that Chris's shooting was accidental. In concluding that the evidence was sufficient to convict Johnson of murder as charged, the jury necessarily rejected the notion that the shooting was accidental. If, however, a self-defense instruction had been given, the jury would have been required to undertake an additional step of analysis. That is, after concluding that Johnson intentionally pulled the trigger, the jury would then need to determine whether Johnson had done so based on a reasonable belief that he needed to use deadly force to protect himself or his children.

¶32    As detailed above, Son's and Johnson's testimony spoke directly to whether Johnson reasonably believed that force was necessary to defend himself or his children against a potential threat by Chris. That testimony provided at least some evidence that Johnson was scared of Chris, that Chris was angry and acting aggressively, that Chris was scaring the children, that Chris moved toward Johnson to hit or attack him immediately before the gun discharged, and that everything happened very quickly. Had the jury been allowed to weigh this evidence when determining Johnson's mens rea, we think the likelihood that the jury would have reached a different outcome, that is, that the jury would have determined that Johnson had a reasonable belief that deadly force was necessary, thereby lowering the charge to something less than murder, is sufficiently high as to undermine our confidence in the verdict. Consequently, the failure to provide the instruction was harmful to Johnson.

## CONCLUSION

¶33    The district court exceeded its discretion when it declined Johnson's request to instruct the jury on imperfect self-defense because the evidence presented at trial provided a reasonable basis for the instruction, and Johnson was prejudiced by the failure to instruct. Accordingly, we reverse Johnson's murder conviction and remand the matter to the district court for a new trial.

_____