**2026 UT App 64**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MARC PERRY YOUNG,
Appellant.

Opinion
No. 20240307-CA
Filed April 23, 2026

Eighth District Court, Duchesne Department
The Honorable Samuel P. Chiara
No. 211800411

Benjamin Miller and Debra M. Nelson,
Attorneys for Appellant

Derek E. Brown, Ginger Jarvis, and Joshua J. Prince,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN FORSTER
concurred.

TENNEY, Judge:

¶1     This case began when a contracted utility worker (Contractor) arrived to replace a power meter at Marc Young's house. For reasons that are more fully set forth below, Young did not believe that Contractor was employed by the power company—Young instead thought that Contractor was actually a trespasser with nefarious intentions. Young confronted Contractor about his suspicions, and at one point during a brief break in the encounter, Young grabbed a nearby shotgun. When Contractor was then able to convince Young that he was indeed working for the power company, the confrontation ended.

¶2     The State later charged Young with aggravated assault, and the case proceeded to a jury trial. Before trial, Young requested an instruction on defense of habitation, but the district court refused to give it. The jury found Young guilty.

¶3     Young now appeals his conviction on two primary grounds. First, Young argues that the district court erred in refusing to give an instruction on defense of habitation. We agree, and we accordingly reverse his conviction. Second, Young argues that his trial counsel (Counsel) provided ineffective assistance by failing to also request a self-defense instruction. We conclude that Young was not entitled to such an instruction, however, so we reject this claim.

## BACKGROUND[1]

### *The Encounter and Investigation*

¶4     Moon Lake Electric (Moon Lake) hired Contractor to change the power meters for its customers, and in March 2021,

---

1. Our recitation of the facts in this case is complicated by the procedural posture. On appeal, we generally "recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (quotation simplified). As discussed below, however, the two issues we address on appeal relate to Young's request for jury instructions relating to proposed affirmative defenses. In reviewing such a request, a court is required to view the evidence in the light most favorable to the defense's case. *See State v. Farmer*, 2025 UT App 57, ¶ 54, 569 P.3d 267, *cert. denied*, 574 P.3d 522 (Utah 2025).

(continued…)

Contractor was tasked with changing the meter at Young's house. On the day in question, Contractor arrived at Young's property around 3:00 p.m. and began speaking with Young at the back door.[2] During this discussion, Contractor explained that he was with Moon Lake and was there to change Young's meter. Contractor had a lanyard around his neck with an identification badge that showed his name and identified him as working with Moon Lake. Contractor also wore a hat with the Moon Lake logo, but he was not otherwise in uniform. Contractor had arrived at Young's property in a truck with a Moon Lake logo on its side, but the truck was parked out of view from the back door.

¶5 Young told Contractor that his meter had been changed recently and that he did not think there was any need for a new meter. Contractor showed Young the meter and meter seals that he intended to install, but Young was still not convinced that Contractor was who he said he was. Young told Contractor that he wanted to verify that Moon Lake had sent him, so Young went inside to call Moon Lake while Contractor waited outside.

¶6 During the ensuing phone call, a Moon Lake employee told Young that Moon Lake did have workers out changing meters, but the employee could not confirm that anyone had been sent to

---

In this case, the parties agree on many of the facts—there are only a few key points of disagreement. In this Background section, we'll generally rely on the undisputed facts. In those instances where the parties disagree, we'll note the disagreement.

2. At trial, Contractor and Young disagreed about how it was that Contractor ended up at the back door. According to Contractor, the two had an initial interaction at the front door, during which Young asked him to come around to the back door. According to Young, however, they never had a discussion at the front door, and Young instead confronted Contractor in the first instance from the back door.

Young's house, and the employee further said that he had "no way to verify" that Contractor was there on Moon Lake's behalf. When Young asked the employee how he could ensure that Contractor was legitimate, the employee suggested that Young should ask Contractor for the name of his supervisor. The employee said that if Contractor provided any name other than the name the employee shared with Young, Contractor did not work for Moon Lake.

¶7     On his way back to the back door, Young grabbed his shotgun, which was sitting by the back door. As will be discussed shortly, the parties later disputed whether Young pointed the shotgun at Contractor once he resumed talking with him—Contractor claimed that Young did, while Young claimed that he did not. While at least holding the shotgun, Young asked Contractor who his supervisor was, and Contractor provided the correct response. Once he did, Young told Contractor that he was free to change the meter, and Young then returned inside.

¶8     Contractor changed the meter and drove away from Young's property. When Contractor was about a half mile down the road, he called his supervisor and told him about the encounter. The next day, Contractor's supervisor contacted law enforcement. During an ensuing investigation, a law enforcement officer (Officer) interviewed both Contractor and Young. Officer also executed a search warrant on Young's house, and during that search, Young provided Officer with the shotgun that he had held during the encounter.

*Young's Request for Affirmative Defense Jury Instructions*

¶9     The State charged Young with one count of aggravated assault, and pursuant to the statute, the State alleged that Young had "[m]ade a threat, accompanied by a show of immediate force or violence, to do bodily injury" to Contractor while using a firearm. *See* Utah Code § 76-5-103(1)(a)(ii).

¶10 The case went to a jury trial. During a discussion with the court before the presentation of evidence began, Young asked the court to prepare a set of jury instructions that are relevant to this appeal. One of them was an instruction on defense of habitation, which was taken directly from the Model Utah Jury Instructions. The State opposed Young's request to give this instruction, contending that it would not be supported by the anticipated evidence. During this same discussion, Young also asked the court to prepare a self-defense instruction. Without any response from the State on this instruction, the court said that it would reserve its decision on whether to give either of the proposed instructions until after the presentation of evidence.

*The Parties' Evidence*

¶11 During the State's case-in-chief, Contractor testified about the general sequence of events described above. Contractor also testified that when he arrived at Young's property, he followed the path to the front door and did not wander around Young's yard. Contractor said that during the initial encounter with Young at the back door, Young was "confrontational" and "agitated" while Contractor was attempting to explain why he was there. Contractor testified that when Young came back to the door after making the call to Moon Lake, Young had the shotgun "trained on" him. Contractor testified that Young pointed the shotgun toward Contractor's "chest and face" and that Young appeared to be "in a firing position for a person who was going to shoot a rifle." Contractor testified that after he answered the question about his supervisor correctly, Young told him, "[I]t's a good thing that you said that name or else you would be dead." Contractor testified that Young did not ask him to leave the property at any point.

¶12 The State also called Officer, who had dealt with Young in the past. Officer testified that based on his previous encounters

with Young, he knew that Young "was unsteady on his feet and . . . had health problems."

¶13 After the State rested, Young testified in his own defense. Young testified that two Moon Lake employees had replaced his meter "at most" three months before the day on which Contractor came to his house. Young testified that those two Moon Lake employees wore badges and were dressed in Moon Lake attire such that "it was obvious that they were with Moon Lake." Young testified that these employees had told him what they were doing and why they were doing it and that "they were very polite." Young testified that Contractor, on the other hand, was dressed in "normal" clothing and had "a giant laminated plastic thing" around his neck. According to Young, this identification badge did not look legitimate. Young testified that due to deteriorating vision, he could not read what was around Contractor's neck.

¶14 Young also testified that before he spoke to Contractor, he had been watching his security cameras when he observed Contractor walking around his yard "nowhere near the power meter." Young said that Contractor was "clear on the other side of [his] yard" "wandering around." Young testified that he had a "clearly visible" "No Trespassing" sign on his property. And Young testified that he could only see the top of Contractor's truck (and not its side). Young testified that seeing Contractor "wandering around" his yard had him "really concerned" and "really worried."

¶15 Young further testified that when Contractor told him, during their initial encounter, that he was there to change the power meter, Young had responded by telling Contractor that he needed to leave the property because the meter had already been changed. Young testified that at that point, Contractor said that he had "every right" to be there and refused to leave.

¶16    Young then testified about the phone call in which the Moon Lake employee told Young that Moon Lake had "no way to verify" whether they had sent someone to change the meter at his address and in which the employee suggested that Young should ask Contractor who his supervisor was.

¶17    Young testified that on his way back to the porch to continue talking to Contractor, he still "had no idea who this guy was." Young testified that he had previously had "strange things happen" on his property and that he generally kept a gun accessible for that reason. He said that as he walked back to the back door, he saw his shotgun sitting by the back door and grabbed it, and he said that he then used it as a crutch because he has a hard time walking. When asked to explain why he grabbed the shotgun, Young said it was because he "felt threatened" when the Moon Lake employee "did not confirm" that Contractor was who he said he was. Young said that at that "point in time," he felt like he was "protecting" himself and his house.

¶18    Young testified that, during the ensuing discussion, he held the shotgun in his hand, but he insisted that he never pointed it at Contractor. According to Young, he asked Contractor for the name of his supervisor, and once Contractor provided the correct answer, he told Contractor to change the meter and then leave the property. In slight contrast to Contractor's version, Young said that after Contractor gave the correct name, he said to Contractor, "[I]t's a good thing you said that, or you wouldn't be here right now." Young then clarified that what he meant by that was that he "would have kicked [Contractor] off [his] property."

¶19    While describing the overall encounter, Young testified that he never saw a weapon on Contractor, and he further said that Contractor did not threaten him, try to break into his house, or threaten to destroy his property. In Young's words, "He didn't do anything."

*The District Court Denies Young's Request for Affirmative Defense*
*Jury Instructions*

¶20    After the close of evidence, and outside the presence of the jury, the district court denied Young's request for an instruction on the defense of habitation. The court broadly concluded that "no evidence has been produced that would justify the use of a firearm in this case." More particularly, the court concluded that, in its view, the evidence showed that Young "used force likely to cause death or serious bodily injury." The court concluded that "no reasonable person could believe under the evidence presented that [Contractor] was attempting an entry in a violent, tumultuous, surreptitious, or stealthy manner" because no "testimony whatsoever . . . would support that." And the court further concluded that no "reasonable person could believe under any . . . of the evidence presented today that there was a felony being committed" because there was "zero evidence of that." The court then stated that for these reasons, it would not "include instructions on defense of habitation, defense of person, or defense of property . . . ." In a further discussion, the court expounded at some length on its belief that an instruction on defense of habitation was not warranted because there was no proof that "a felony was about to happen." In passing, the court also said that there were no grounds for "a self-defense affirmative defense here."

*Closing Arguments and Conviction*

¶21    During the defense's closing argument, Counsel urged the jury "to look at this from Mr. Young's perspective and decide whether Mr. Young was reasonable in taking the perspective that he had and in reacting the way that he did." Counsel pointed out that from Young's perspective, an unknown individual who was not wearing a uniform was on his property, this individual refused to leave when asked, and an employee from Moon Lake could not verify that this individual was working for the

company. Counsel then argued that in light of these facts, Young had reasonably decided to at least hold his shotgun while he ascertained who this individual was.

¶22 The jury found Young guilty of aggravated assault, and Young later filed a timely notice of appeal.

ISSUES AND STANDARDS OF REVIEW

¶23 On appeal, Young first argues that the district court erred in refusing to give a jury instruction on defense of habitation. "[I]f a criminal defendant asserts that the district court did not provide an instruction to which the defendant was legally entitled," such as "an affirmative defense for which there was an evidentiary basis," the applicable standard of review is correctness. *State v. Hunt*, 2025 UT 54, ¶ 46, 582 P.3d 772.

¶24 Second, Young argues that Counsel provided ineffective assistance by failing to request a self-defense jury instruction. Where an ineffective assistance claim is raised for the first time on appeal and there is no lower court ruling to review, we resolve it as a matter of law. *See State v. Thomas*, 2025 UT App 145, ¶ 15, 579 P.3d 416.

ANALYSIS

I. Defense of Habitation

¶25 A defendant in a criminal case is legally entitled to an affirmative defense jury instruction if there is an evidentiary basis for the instruction. *See State v. Hunt*, 2025 UT 54, ¶ 46, 582 P.3d 772. A court is thus "obligated to give the instruction if evidence has been presented—either by the prosecution or by the defendant—that provides any reasonable basis upon which a jury could conclude that the affirmative defense applies to the

defendant." *State v. Johnson*, 2025 UT App 13, ¶ 24, 564 P.3d 519 (quotation simplified), *cert. denied*, 574 P.3d 520 (Utah 2025); *see also State v. Farmer*, 2025 UT App 57, ¶ 41, 569 P.3d 267 (same), *cert. denied*, 574 P.3d 522 (Utah 2025). And when presented with a request for such an instruction, a court must view the evidence "in the light most favorable to the defense." *Farmer*, 2025 UT App 57, ¶ 54 (quotation simplified). But even so, a "court need not instruct the jury on a requested affirmative defense" if "the evidence is so slight as to be incapable of raising a reasonable doubt in the jury's mind as to whether the defendant acted in accordance with that affirmative defense." *State v. Devan*, 2024 UT App 193, ¶ 54, 562 P.3d 1233 (quotation simplified), *cert. denied*, 568 P.3d 261 (Utah 2025).

¶26 The affirmative defense primarily at issue in this appeal is defense of habitation. At the time of the events in question, the controlling statute read as follows:

> (1) A person is justified in using force against another when and to the extent that he reasonably believes that the force is necessary to prevent or terminate the other's unlawful entry into or attack upon his habitation; however, he is justified in the use of force which is intended or likely to cause death or serious bodily injury only if:
>
> > (a) the entry is made or attempted in a violent and tumultuous manner, surreptitiously, or by stealth, and he reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person, dwelling, or being in the habitation and he reasonably believes that the force is necessary to prevent the assault or offer of personal violence; or

> (b) he reasonably believes that the entry is made or attempted for the purpose of committing a felony in the habitation and that the force is necessary to prevent the commission of the felony.

Utah Code § 76-2-405 (1985).[3]

¶27 Under the plain text of this statute, it seems to us that there were two distinct variants of this affirmative defense.

- We'll refer to the first as Baseline Defense of Habitation. This version applied when the force involved was *not* "intended or likely to cause death or serious bodily injury." *Id.* § 76-2-405(1). In such a circumstance, the use of force was justified "when and to the extent that [the actor] reasonably believe[d] that the force [was] necessary to prevent or terminate the other's unlawful entry into or attack upon his habitation." *Id.*

- We'll refer to the second as Heightened Defense of Habitation. This version applied to the use of force that *was* "intended or likely to cause death or serious bodily injury." *Id.* In such a circumstance, the use of force was justified only if the terms set forth in subsection 405(1)(a)–(b) were satisfied.[4]

---

3. For purposes of this opinion, we rely on the version of this statute first enacted in 1985 because it was the version still in effect at the time of the charged crime. With the exception of our reference to the current version of the statute in footnote 4, references to the statute in this opinion are to the 1985 version.

4. This statute was amended in 2024, and the current version of the statute makes the distinction between these two variants even

(continued…)

¶28    In this sense, these two variants were applicable to different kinds of force and required proof of different justifications. We'll address Young's particular arguments regarding the elements of this defense below. Before doing so, we first note three points that broadly inform our analysis.

¶29    First, as noted, in reviewing whether Young was entitled to an instruction on defense of habitation, a court must view the evidence in a light most favorable to Young's version of the events. *See Farmer*, 2025 UT App 57, ¶ 54. One particular place where this matters in this appeal is the question of whether Young pointed the shotgun at Contractor. At trial, Contractor testified that Young did, but Young testified that he did not. From our review, it seems that the district court started with the assumption that Young did point the shotgun—after all, the court began its ruling on Young's request for the affirmative defense by observing that the evidence showed that Young "used force likely to cause death or serious bodily injury," which seems at odds with a version of the events in which Young kept the shotgun pointed at the ground the whole time. But in reviewing the request for a jury instruction, the court should have accepted Young's version of the events on this and any other factual question. We'll do so here as well.

¶30    Second, working off the assumption that the shotgun was pointed down the whole time, the parties on appeal have disagreed about whether this would qualify as "force" for purposes of aggravated assault. But we have not been presented with a sufficiency challenge on appeal. Instead, the question before us concerns the denial of Young's request for a jury

---

clearer by separating them into different subsections. *Compare* Utah Code § 76-2-405(1) (2024) (outlining the elements of what we've referred to as Baseline Defense of Habitation), *with id.* § 76-2-405(2) (2024) (outlining the elements of what we've referred to as Heightened Defense of Habitation).

instruction. For purposes of our analysis, we'll assume that a jury could find that Young merely brandished the shotgun (but did not point it), and we'll likewise assume that the jury could find that this qualified as "force" for purposes of that element of aggravated assault. The question we'll answer is whether Young would have then been entitled to an instruction on defense of habitation.[5]

¶31 Third, the statute repeatedly speaks of the defense of "habitation." *See* Utah Code § 76-2-405. In its brief, the State asserted that this term only refers to the house itself, as opposed to the yard or curtilage. In support, the State cited a law review article that said that only "nine states" (none of which were Utah) have "extended the defense of habitation" to curtilage. Cynthia Lee, *Firearms and the Homeowner: Defending the Castle, the Curtilage, and Beyond*, 108 Minn. L. Rev. 2889, 2972 n.382 & appendix J (2024). Young did not respond to this assertion in his reply brief, and when asked about this at oral argument, Young's appellate counsel agreed with the State's view of this term. But given that some states have extended this defense to the curtilage, and given the potential importance of this issue, we think it prudent to leave this question open for now. On the state of this briefing, we'll assume for purposes of this appeal that the statute's reference to "habitation" does not extend to the curtilage. But even so, "we leave open the possibility that, if some future case arises" in which this argument is contested and more fully briefed, "we may consider [it] anew." *Keisel v. Westbrook*, 2023 UT App 163, ¶ 52 n.9, 542 P.3d 536.

¶32 Turning to the merits of this appeal, the question, again, is whether Young was entitled to an instruction on this defense. And

---

5. Indeed, if the jury thought that Young did not ever use force for purposes of this element of aggravated assault, it would acquit him of the charged offense outright and therefore would not need to reach the affirmative defense at all.

as noted, Young was entitled to an instruction if there was some basis in the evidence from which the jury could find that Young had satisfied its elements, and in making this assessment, we'll view the evidence in the light most favorable to Young's version of the events.

¶33 **Baseline Defense of Habitation.** We first agree with Young that the jury could find that his conduct was justified under the Baseline Defense of Habitation. Under Young's version of the events, at the time that he held (but did not point) the shotgun, he had reason to believe that Contractor was trespassing on his property, was impersonating a Moon Lake employee, and was now refusing to leave. The evidence that supported these beliefs included the following:

- There was a visible "No Trespassing" sign in Young's driveway, which Contractor had ignored.

- Contractor claimed he was there to replace a power meter, but Young thought this was a false claim. This was so, in Young's view, because:

  o Young had already observed Contractor on the security camera, and Contractor was not near the power meter but was instead "wandering around";

  o the meter had just been replaced a few months earlier;

  o when the meter was previously replaced, this was done by two Moon Lake employees who were wearing "obvious" Moon Lake uniforms;

  o unlike the Moon Lake employees, Contractor was not wearing a uniform;

- the plastic identification card that Contractor was wearing around his neck looked fake to Young; and

- Contractor had parked his truck (which had a Moon Lake logo on it) in a place where Young was unable to see its side (and its logo).

- Because Young did not believe Contractor was who he said he was, he asked Contractor to leave, but Contractor refused.

- Young then called Moon Lake, and an employee could not verify that Contractor was there on Moon Lake's behalf.

¶34    If the evidence is viewed in this manner, we agree with Young's assertion that a jury could conclude that Young reasonably believed that Contractor was trespassing on his property—and, presumably, also had designs to enter his house—with nefarious intent. After all, it appeared to Young that Contractor was not only trespassing, but that Contractor had gone to the trouble of faking an identification badge, that he was pretending to be someone he was not, and that he was now refusing to leave when asked.

¶35    The State nevertheless argues that Young could not have reasonably believed that "pulling a gun out was necessary to get [Contractor] to leave." And this is indeed a relevant point—as discussed, the availability of this defense required some showing that Young could reasonably believe that the force was "necessary to prevent or terminate the other's unlawful entry into or attack upon his habitation." Utah Code § 76-2-405(1).

¶36    We agree with the State that the word "necessary" is doing some work here. But we also agree with Young that the word "prevent" is doing some work here as well. The word "prevent" is commonly understood as meaning "to keep from happening"

or "to hold or keep back."[6] Here, Young was "unsteady on his feet" and "had health problems." And as discussed, Young had what he thought was a trespasser on his property who had apparently faked an identification, was acting strangely, and was refusing to leave. Moreover, in the phone conversation with an employee from Moon Lake, the employee could not verify that Contractor was working for the company, and the employee then suggested that Young should now engage in further dialogue with Contractor to settle the matter. Since Contractor was still standing on Young's porch, we think that a jury could conclude that Young was entitled to grab his shotgun and at least hold it while speaking with Contractor as a means of preventing an unlawful entry into his house during that conversation.

¶37    As a result, we believe that there was a reasonable basis from which a jury could conclude that Young had satisfied the elements of Baseline Defense of Habitation. The district court therefore erred in ruling that Young was not entitled to a jury instruction about it.

¶38    **Heightened Defense of Habitation.** Turning to the latter part of the statute—which, again, is what we've referred to as Heightened Defense of Habitation—we again note that under the version of the statute that was then in effect, if the use of force was "intended or likely to cause death or serious bodily injury," that kind of force was only justified if the additional terms set forth in subsection 405(1)(a)–(b) were satisfied. These terms required the jury to find one of two scenarios.

- Subsection (a) required that "the entry [was] made or attempted in a violent and tumultuous manner, surreptitiously, or by stealth, *and* [Young] reasonably believe[d] that the entry [was] attempted or made for the

---

6.    *Prevent*,    Merriam-Webster,    https://www.merriam-webster.com/dictionary/prevent [https://perma.cc/4R8E-3R23].

purpose of assaulting or offering personal violence to any person, dwelling, or being in the habitation *and* he reasonably believe[d] that the force [was] necessary to prevent the assault or offer of personal violence." Utah Code § 76-2-405(1)(a) (emphases added).

- Alternatively, subsection (b) required that Young "reasonably believe[d] that the entry [was] made or attempted for the purpose of committing a felony in the habitation and that the force [was] necessary to prevent the commission of the felony." *Id.* § 76-2-405(1)(b).

Young has not persuaded us that he was entitled to an instruction under either of these subsections.

¶39   Starting with subsection (a), we note that under Young's version of the facts, Contractor arrived at Young's house around 3:00 p.m., and after Contractor walked around the yard a bit, Young initiated a conversation with him at the back door. Of particular note here, Young testified that he did not see a weapon on Contractor, and he further testified that Contractor never threatened him or tried to destroy any property. Because of this, we don't see any basis from which a jury could reasonably find that there was an "entry" or an "attempted entry" that was made in a "violent and tumultuous manner," "surreptitiously," or "by stealth," nor do we see any evidence suggesting that Young could have believed that force was necessary to prevent an "assault or offer of personal violence." *Id.* § 76-2-405(1)(a).

¶40   Turning to subsection (b), Young made only a few passing references to this subsection's particular elements in the relevant portion of his opening brief. Young did address this subsection a bit more robustly in the portion of his brief dealing with his Second Amendment claim (which we'll discuss below in note 8). But even there, Young never developed an argument about which particular felony he believed was at issue or how it would justify

heightened force under this subsection. Given this, the State had no reason to respond to a subsection (b) argument in its brief, and in fact didn't. For these reasons, we don't believe that Young has carried his burden of demonstrating that he was entitled to an instruction under this subsection.

¶41 **Prejudice.** In light of the above, the remaining question is whether Young was prejudiced by the court's refusal to give an instruction on Baseline Defense of Habitation. We conclude that he was.[7]

¶42 For claims such as this one, an "error is harmful only if the likelihood of a different outcome is sufficiently high that it undermines our confidence in the verdict." *Johnson*, 2025 UT App 13, ¶ 30 (quotation simplified). "While we more readily find errors to be harmless when confronted with overwhelming evidence of the defendant's guilt, we are more willing to reverse when a conviction is based on comparatively thin evidence." *State v. Thompson*, 2014 UT App 14, ¶ 73, 318 P.3d 1221 (quotation simplified). "Likewise, courts are more likely to reverse a jury

---

7. Just to be analytically clear, for purposes of deciding whether Young was *entitled* to the instruction, we are required to view the evidence in the light most favorable to the defense. But for purposes of determining whether Young was *prejudiced* by its absence, we're tasked with assessing the facts presented at trial and then determining on our own whether it's sufficiently likely that, if the instruction had been given, the result at trial would have been different. *See, e.g., State v. Reece*, 2015 UT 45, ¶ 40, 349 P.3d 712 (concluding that a district court's error in denying a requested lesser-included-offense instruction was harmless because "there was overwhelming evidence" against the defendant and there was no reasonable likelihood that the jury would have acquitted, so this court's "confidence in the verdict [was] not undermined").

verdict if the pivotal issue at trial was credibility of the witnesses and the errors went to that central issue." *Id.*

¶43 In *Johnson*, we held that a defendant was prejudiced by a district court's failure to give the jury a requested instruction on an affirmative defense. *See* 2025 UT App 13, ¶ 32. The defendant there had been convicted of murder, and on appeal, we considered whether the district court erred by denying his request for jury instructions on self-defense. *See id.* ¶¶ 17, 19–21. We concluded that the court did err. *See id.* ¶ 29. And after doing so, we concluded that the defendant was prejudiced. *See id.* ¶ 32. We reasoned that because the defendant's primary theory at trial was that the shooting in question had been accidental, the jury necessarily rejected that notion by finding there was sufficient evidence to convict the defendant of murder. *See id.* ¶ 31. We then noted that if the requested self-defense instruction had been given, "the jury would have been required to undertake an additional step of analysis"—namely, it would have needed to consider whether the defendant's actions were justified. *Id.* Based on the evidence presented at trial, we concluded that if the jury had undertaken that additional step of analysis, "the likelihood that the jury would have reached a different outcome" was "sufficiently high as to undermine our confidence in the verdict." *Id*. ¶ 32.

¶44 We reach the same conclusion for somewhat similar reasons here. The State charged Young with aggravated assault, and it asked the jury to find that Young "[m]ade a threat, accompanied by a show of immediate force or violence, to do bodily injury" to Contractor while using a firearm. *See* Utah Code § 76-5-103(1)(a)(ii). As noted, the jury convicted Young, meaning that it found that Young's conduct included a threat accompanied by "a show of immediate force or violence." Because the jury was not given an affirmative defense instruction, its analysis stopped there.

¶45    As noted, however, Young's defense at trial was that he did not point the shotgun at Contractor, but that he had instead simply (and reasonably) grabbed it so that he could defend himself and his house while he ascertained Contractor's true purpose. This was why he wanted the jury to be instructed to consider whether his actions were justified as a defense of habitation. Thus, if the jury had been given this instruction, it "would have been required to undertake an additional step of analysis." *Johnson*, 2025 UT App 13, ¶ 31. And the district court's erroneous refusal to give this instruction essentially left Young with no legal foundation for the defense that he still tried advancing at trial. In this sense, once the jury found that Young had made a threat and used force for purposes of the elements of aggravated assault, its only option was to convict—and this would have been so even if it had believed that Young acted reasonably in an attempt to protect his house.

¶46    Moreover, having considered the record, we're persuaded that there is a reasonable likelihood that the jury would have accepted this defense. The State's evidence in this case was not overwhelming. The two sides agreed on most of what had transpired factually. The key point of factual dispute was whether during the second confrontation, Young pointed the shotgun at Contractor. But on this point of dispute, this was essentially a he-said/he-said case with no corroborating evidence either way, and it's not clear to us that the jury had to have accepted either version.

¶47    Beyond this, and regardless of whether the shotgun was or was not pointed at Contractor, in a counterfactual world in which the jury had been properly instructed on the defense of habitation, the jury would have ultimately been asked to assess whether Young reasonably believed that the force was necessary to prevent an unlawful entry into his house. Again, the backdrop for this would have been the various circumstances we've discussed—the fact that the meter had apparently just been

changed a few months earlier, as well as the various reasons Young had for believing that Contractor was not who he was claiming to be. Given Young's seemingly vulnerable state, the fact that Young was not initiating a confrontation out in public but was instead purporting to defend his house, and the fact that a Moon Lake employee had now suggested that Young should go back to the porch and have additional conversation with Contractor, we think it's at least reasonably likely that a jury would have concluded that Young could reasonably believe that it was necessary to hold a gun while re-engaging with Contractor at his own back door.

¶48    We see this as a close case. But pulling it all together, we note that the State bore the burden of proving its case beyond a reasonable doubt, many of the undisputed facts supported Young's version of the events and his proposed affirmative defense, and, again, the court's erroneous failure to give the requested instruction deprived Young of the legal foundation for his defense. In these circumstances, our confidence in this verdict is undermined. We therefore reverse.[8]

---

8. In a separate issue in his brief, Young also argued that the court's refusal "to instruct the jury on defense of habitation violated his "[r]ight to [b]ear [a]rms." In Young's view, if the court was correct that Young was not able to present a defense of habitation instruction, "then convicting a law-abiding citizen [for] possessing a gun to protect himself on his own property runs afoul of the Second Amendment and Article I, Section 6 of the Utah Constitution." In various places in his brief, however, Young made it clear that this argument was expressly conditional—i.e., it was operative only if we concluded that he was not entitled to a defense of habitation jury instruction. Because we've now concluded that he was entitled to the instruction, we have no occasion to rule on this argument.

(continued…)

## II. Self-Defense

¶49 Young also argues that he received ineffective assistance because Counsel did not ask for a self-defense instruction. Although we could in theory choose not to address this issue, given our reversal on the defense of habitation issue, the parties have fully briefed this issue and it seems likely to arise in some form on remand. We accordingly think it appropriate to address it now. *See State v. Ogden*, 2018 UT 8, ¶ 49, 416 P.3d 1132 ("Although it is unnecessary to our decision, we retain the authority to reach issues when we believe our analysis could prove helpful on remand."). For the reasons set forth below, we see no basis for reversal.[9]

---

And this is so even though we've just concluded that Young has not shown that he was entitled to an instruction for what we've called Heightened Defense of Habitation. As we understand it, the conditional nature of Young's Second Amendment argument turned on the inability to raise this defense generally. We don't understand Young to have argued that his Second Amendment rights were so broad that there was a constitutional violation even if we conclude that he was only entitled to one aspect of the statutory defense.

9. We note that this issue is presented to us in a decidedly unusual posture. In his opening brief, Young asserted that Counsel provided ineffective assistance by not requesting a self-defense instruction. In doing so, he acknowledged that while Counsel initially asked the district court to prepare such an instruction for later discussion, at the end of trial, Counsel failed to expressly ask for one. In his opening brief, Young did not separately argue that this could also be addressed as a preserved issue—in other words, Young only presented this as an ineffective assistance claim.

(continued…)

In its responsive brief, the State responded by asserting that Counsel did properly preserve a request for a self-defense instruction. In the State's view, this meant that the ineffective assistance claim must fail "because [C]ounsel did what Young now faults him for not doing." Having made that argument, the State then alternatively argued that Young's claim failed in any event on the merits because he was not entitled to the instruction. This case thus presents a preservation role reversal, where, in contrast to how preservation fights usually go, the defendant is asserting that his chosen issue was *not* preserved, while the State is claiming that it *was.*

In *State v. Kitches*, we held that "if the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." 2021 UT App 24, ¶ 28, 484 P.3d 415 (emphasis omitted). The animating idea behind this rule is that because the preservation rule is ultimately "self-imposed" and discretionary with the appellate court, principles of judicial economy are sometimes best served by bypassing a fight about whether an issue was preserved and instead simply deciding the issue in the appellee's favor on the merits. *See id.* ¶¶ 27–28. And such an outcome is particularly warranted where doing so will not "alter[] the incentive to object at trial." *Id.* ¶ 28.

We think these same principles apply here. Everyone agrees that Counsel brought up self-defense in the initial proceedings, but on appeal, Young's appellate counsel apparently believed Counsel needed to have done more, which is why appellate counsel briefed the issue through the prism of an ineffective assistance claim. As explained below, we ultimately agree with the State that Young was not entitled to such an instruction. Because this will not impact the preservation incentives in any way or prejudice the State, we'll assume for argument only that the issue was not preserved, and we'll then accept Young's invitation to address this issue through the prism of an ineffective assistance claim.

¶50     To succeed on his claim of ineffective assistance of counsel, Young must show that (1) he received deficient performance and (2) the "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Miller*, 2023 UT App 85, ¶ 25, 535 P.3d 390 (quotation simplified). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim," we can resolve a claim on the basis of either prong. *State v. Popp*, 2019 UT App 173, ¶ 25, 453 P.3d 657 (quotation simplified).

¶51     To demonstrate deficient performance, Young "must demonstrate Counsel's representation fell below an objective standard of reasonableness." *State v. Sandoval*, 2024 UT App 186, ¶ 19, 562 P.3d 731 (quotation simplified). "The deficient performance inquiry should focus on whether counsel's assistance was reasonable considering all the circumstances, and it must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quotation simplified). "Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." *State v. Broadwater*, 2024 UT App 184, ¶ 35, 562 P.3d 739 (quotation simplified), *cert. denied*, 564 P.3d 959 (Utah 2025). This was so here.

¶52     As discussed above, a criminal defendant is legally entitled to an affirmative defense jury instruction if there is an evidentiary basis for the instruction. *See Hunt*, 2025 UT 54, ¶ 46. The self-defense statute states that "[a]n individual is justified in threatening or using force against another individual when and to the extent that the individual reasonably believes that force or a threat of force is necessary to defend the individual or another individual against the imminent use of unlawful force." Utah Code § 76-2-402(2)(a).

¶53 Above, we concluded that there was some basis from which a jury could reasonably think that Young thought Contractor was a trespasser who was acting with nefarious intent. But even from Young's version of the facts, we see no evidentiary basis from which Young had any reason to think that Contractor was about to use unlawful force, much less that Contractor was about to do so imminently. Again, Young testified that he did not see a weapon on Contractor, and he further testified that Contractor never made any threat of harm toward him.

¶54 As a result, even viewing the evidence in a light most favorable to Young, we conclude that Young was not entitled to a self-defense instruction. Because of this, we conclude that Counsel did not provide ineffective assistance by not requesting such an instruction.

CONCLUSION

¶55 For the reasons set forth above, we conclude that the district court should have given an instruction on defense of habitation and that Young was prejudiced by its absence, but we reject his assertion that he received ineffective assistance when Counsel did not separately request a self-defense instruction. We accordingly reverse Young's conviction and remand for a new trial.

––––––––––